**JUDGE McMAHON**



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X

AL SOLUTIONS, INC.,                  :

       Plaintiff,                    :

vs.                                  :    Case No.

JAMEGY, INC. a/k/a TITAN HOLDINGS,   :
INC. and JAMEGY WV, INC. a/k/a TITAN
HOLDINGS WV, INC.,                   :

       Defendants.

------------------------------------ X

## NOTICE OF REMOVAL

Defendant Titan Holdings, Inc., formerly known as Jamegy, Inc., and Defendant Titan

Holdings WV, Inc., formerly known as Jamegy WV, Inc. (together "Defendants"), pursuant to

28 U.S.C. § 1441(b), hereby file this Notice of Removal of the above-captioned action to the

United States District Court for the Southern District of New York from the Supreme Court of

the State of New York where the action is now pending, captioned *AL Solutions, Inc. v. Jamegy,*

*Inc. a/k/a Titan Holdings, Inc. and Jamegy WV, Inc. a/k/a Titan Holdings, WV, Inc.*, Index No.

601547/2008, and state:

      1.     Upon information and belief, Plaintiff AL Solutions, Inc. commenced this action

in the Supreme Court of the State of New York, County of New York, on May 20, 2008. A copy

of the complaint is attached as Exhibit "A."

      2.     The parties stipulated to electronic service of process, and the Defendants

accepted service of the complaint on May 27, 2008. A copy of the stipulation is attached as

Exhibit "B."

3.      Plaintiff AL Solutions, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in New Cumberland, West Virginia. (Ex. A, at 3).

4.      Defendant Titan Holdings, Inc. and Defendant Titan Holdings WV, Inc. are privately held corporations organized under the laws of the State of Oregon, with their principal places of business in Portland, Oregon. (Ex. A, at 3-4). On or about January 18, 2007, Jamegy, Inc. changed its name to Titan Holdings, Inc. (Ex. A, at 3). On or about January 16, 2007, Jamegy WV, Inc. changed its name to Titan Holdings WV, Inc. (Ex. A, at 4).

5.      Pursuant to 28 U.S.C. §1332, this Court has jurisdiction over this action. The Defendants may remove this action to this Court under 28 U.S.C. §1441(b), because it is a civil action between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.      Venue is proper in this judicial district because this matter was originally filed in the Supreme Court of the State of New York, County of New York.

7.      Removal is timely pursuant to 28 U.S.C. § 1446(b) because this notice is filed within thirty days of the date of service upon the Defendants.

8.      Pursuant to 28 U.S.C. § 1446(d), Defendants will promptly file a copy of this Notice of Removal with the clerk of the Supreme Court of the State of New York, County of New York, and give Plaintiff and Plaintiff's counsel of record a copy of this Notice of Removal.

Therefore, Defendants respectfully request that this case proceed before this Court as an action properly removed.

Dated: June 18, 2008

Respectfully submitted,

COOLEY GODWARD KRONISH LLP

By: _____
            Maxine G. Sleeper

Maxine G. Sleeper (MS 9533)
1114 Avenue of the Americas
New York, NY 10036-7798
(212) 479-6000

Robert R. Vieth
Joseph J. Samarias
Hans H. Chen (HC4379)
One Freedom Square
Reston Town Center
11951 Freedom Drive
Reston, VA  20190-5656
(703) 456-8000

*Attorneys for Defendants Titan Holdings,
Inc. f/k/a Jamegy, Inc. and Titan Holdings,
WV, Inc. f/k/a Jamegy WV, Inc.*

satisfactory to the Purchaser; (C) such other instruments as Seller may be required to execute in order to evidence and effectuate the transfer of the Assets to Purchaser (including any transfer tax forms required by applicable law); (D) such other agreements and instruments as the Purchaser may reasonably request in order to consummate the transactions contemplated hereunder; (E) such good standing certificates, officer certificates and other similar documents as Purchaser may reasonably request to ensure that the actions required to be taken by Seller at the Closing have been properly authorized, and (F) evidence of full satisfaction of the tax obligations of E. Niles Kenyon, Frank Roberts, Dr. Joseph A. Megy, Devin Megy and David Whitehead in connection with the issuance to each of shares of capital stock in the Purchaser.

### 1.9.    Working Capital Adjustment.

(a)    At least five (5) business days prior to the Closing, Seller shall prepare and deliver to Purchaser a statement (the *"Estimated Adjustment Statement"*) setting forth an estimate of the Net Working Capital as of the end of business on the Closing Date (the *"Estimated Closing Working Capital"*), which Estimated Closing Working Capital shall be prepared in good faith and in accordance with generally accepted accounting principles for financial reporting in the United States (*"GAAP"*) consistent with past practices and prepared in the same manner as the Base Balance Sheet (as defined below) and in accordance with the principles and calculations set forth on Schedule 1.9(a), and such Estimated Adjustment Statement shall include a calculation of the adjustment to the payments at Closing (the *"Estimated Adjustment"*). If the Estimated Closing Working Capital is greater than the Working Capital Threshold Amount, then the amount to be paid by Purchaser at the Closing in accordance with Section 1.4(a) will be increased by the amount of such difference, and if the Estimated Closing Working Capital is less than the Working Capital Threshold Amount, then the amount to be paid by Purchaser at the Closing in accordance with Section 1.4(a) will be decreased by the amount of such difference. Purchaser shall be entitled to review the statement. Seller shall provide Purchaser with all documentation reasonably necessary to support such calculation and Purchaser shall provide Seller with all documentation reasonably necessary to support Purchaser's calculation of Estimated Closing Working Capital if different from Seller's. Purchaser and Seller shall use good faith efforts to resolve any disputes regarding such calculation prior to the Closing. To the extent the Parties cannot agree upon such differences, the Estimated Adjustment at Closing shall be calculated using the Estimated Closing Working Capital, as modified by the mutual agreement of Seller and Purchaser.

(b)    Within forty five (45) days of the Closing Date, Purchaser shall prepare and deliver to Seller a statement (the *"Final Adjustment Statement"*) setting forth its calculation of the Net Working Capital as of the end of business on the Closing Date (the *"Closing Working Capital"*) and the difference, if any, between the Closing Working Capital and the Estimated Closing Working Capital. If within thirty (30) days following delivery of the Final Adjustment Statement Seller has not given Purchaser written notice of its objection to the Closing Working Capital calculation (which notice shall state in reasonable detail the basis of Seller's objection), then the Closing Working Capital calculated by Purchaser shall be binding and conclusive on all Parties hereto and be used in computing the Final Working Capital Adjustment as provided in Section 1.9(c). Purchaser shall provide Seller with all documentation reasonably necessary to support Purchaser's calculation and Seller shall provide Purchaser with all documentation necessary to support Seller's calculation of Closing Working Capital if different from

Purchaser's. If Seller gives Purchaser such notice of objection within such thirty-day period, and if Seller and Purchaser fail to resolve the issues outstanding with respect to the calculation of the Closing Working Capital within thirty (30) days of Purchaser's receipt of Seller's objection notice, Seller and Purchaser shall submit the issues remaining in dispute to PricewaterhouseCoopers or another mutually agreeable firm (the *"Independent Accountant"*) for resolution applying the principles, policies and practices set forth below. If issues are submitted to the Independent Accountant for resolution, (i) Seller and Purchaser shall furnish or cause to be furnished to the Independent Accountant such work papers and other documents and information relating to the disputed issues as the Independent Accountant may request and are available to that party or its agents and shall be afforded the opportunity to present to the Independent Accountant any material relating to the disputed issues and to discuss the issues with the Independent Accountant; (ii) the determination by the Independent Accountant, as set forth in a notice to be delivered to both Seller and Purchaser within forty five (45) days of the submission to the Independent Accountant of the issues remaining in dispute, shall be final, binding and conclusive on the Parties and shall be used in the calculation of the Closing Working Capital; and (iii) Seller and Purchaser shall be equally responsible for the fees and costs of the Independent Accountant for such determination.

(c)    Once the Closing Working Capital has been finalized in accordance with Section 1.9(b) above, then the amount to be paid by either Purchaser or Seller to the other (the *"Final Working Capital Adjustment"*) in the event the Closing Working Capital does not equal the Estimated Closing Working Capital shall be equal to: (i) in the event that the Closing Working Capital is less than the Estimated Closing Working Capital, then Seller shall pay to Purchaser an aggregate amount equal to such difference; and (ii) in the event that the Closing Working Capital is greater than the Estimated Closing Working Capital, then Purchaser shall pay to Seller an aggregate amount equal to such difference.

(d)    For purposes of this Section 1.9, the following terms shall have the meanings set forth below:

*"Net Working Capital"* shall mean the difference between (i) the current assets of Seller related to the Business to the extent included in "Assets", including all accounts receivable, inventory and prepaid expenses, but excluding cash, cash equivalents and the claims referenced in Section 1.2(b), and (ii) the assumed current liabilities of the Seller, if any, to the extent included in the "Assumed Liabilities". All calculations of Net Working Capital made by the parties pursuant to this Section 1.9 shall be prepared in good faith and in accordance with GAAP consistent with past practices and prepared in the same manner as the Base Balance Sheet (as defined below) and in accordance with the principles and calculations set forth on Schedule 1.9(d).

*"Working Capital Threshold Amount"* shall be an amount equal to $2,852,201, representing the Net Working Capital of Seller as of August 31, 2006, as set forth on Seller's balance sheet as of such date and prepared in accordance with GAAP consistent with past practices, and adjusted to exclude current assets that would not constitute "Assets" hereunder and current liabilities that would not constitute "Assumed Liabilities" hereunder, in each case if the

9

Closing Date was August 31, 2006, and according to the principles and calculations set forth in Schedule 1.9(a).

(e)    All amounts payable pursuant to this Section 1.9 shall be paid in immediately available funds within ten (10) business days of the final determination of the Closing Working Capital; provided, however, that any amounts owed by Seller pursuant to Section 1.9(c) shall be paid from the Escrow Fund, and Purchaser and Seller shall instruct the Escrow Agent accordingly upon such final determination.

1.10.    Further Assurances. Seller and Purchaser from time to time after the Closing at the request of any other party hereto and without further consideration shall execute and deliver further instruments of transfer and assignment and take such other action as a party may reasonably require to more effectively transfer and assign to, and vest in, Purchaser, the Assets and all rights thereto, and to fully implement the provisions of this Agreement and the transactions contemplated hereby. In addition, Seller from time to time after the Closing, in connection with its defense of the legal matter described in Schedule 1.3(b)(1) and the satisfaction of other of its Retained Liabilities, may reasonably request access to any books and records and other information transferred by the Seller to the Purchaser in connection with the transactions contemplated by this Agreement; provided that such requests do not interfere with Purchaser's operation of the Business. Such access shall not be unreasonably denied. In addition, Seller and Purchaser agree to work together in good faith to manage certain administrative matters that may arise after the Closing including, without limitation, the delivery of any official correspondence or payments directed to one party but received by another that are not the property of receiving party or that may be reasonably related to the satisfaction of the Seller's Retained Liabilities or Purchaser's Assumed Liabilities, as the case may be.

1.11.    Contracts. Nothing in this Agreement will constitute a transfer or an attempted transfer of any Contract or any Governmental Authorization which by its terms or under applicable law or governmental rules or regulations requires the Consent of a third party (including a governmental authority) unless such Consent or Governmental Authorization shall have been obtained. In the event such Consent is not obtained in connection with the transactions contemplated at Closing, and the Parties proceed with such Closing, Purchaser shall not waive any of its rights in respect of such failure by Seller to obtain such Consent, but Seller shall use its commercially reasonable efforts to secure an arrangement satisfactory to Purchaser intended to provide Purchaser following the Closing with all of the benefits under such Contract or Governmental Authorization; provided, however, nothing in this Section 1.11 shall excuse Seller from using its commercially reasonable efforts to obtain a Required Consent (as defined below).

10

2. **REPRESENTATIONS AND WARRANTIES OF SELLER.** In order to induce Purchaser to enter into this Agreement and consummate the transactions contemplated hereby, each Seller hereby jointly and severally represents and warrants to Purchaser (and each Stockholder, severally and not jointly, represents and warrants, only with respect to the matters set forth in Sections 2.16(b) and 2.17(b) as to its own compliance with such Sections) that, except as set forth in the Seller Disclosure Schedules (unless the context otherwise requires, as used in this Section 2 the term "Seller" shall apply to and mean each Seller):

2.1.    **Organization and Qualification of Seller.** Seller is a corporation duly organized and validly existing under the laws of the State of Oregon with full corporate power and authority to own or lease its properties and to conduct its business in the manner and in the places where such properties are owned or leased or such business is currently conducted or proposed to be conducted. The copies of Seller's Articles of Incorporation as amended to date, certified by the Secretary of State of the State of Oregon, and of Seller's Bylaws, as amended to date, certified by Seller's Clerk or Secretary, and heretofore delivered to Purchaser's counsel, are complete and correct, and no amendments thereto are pending. Seller is not in violation of any term of its Articles of Incorporation or Bylaws. Seller is duly qualified to do business as a foreign corporation in each jurisdiction where the nature of its business and properties render such qualification necessary, and it is not required to be licensed or qualified to conduct its business or own its property in any other jurisdiction except where the failure to be so qualified would not have a material adverse effect on the assets or the Business.

2.2.    **Capital Stock of Seller; Beneficial Ownership.**

(a)    The authorized capital stock of Jamegy consists of: (i) ten thousand (10,000) shares of voting (Class A) Common Stock, no par value, of which one thousand (1,000) shares are duly and validly issued, outstanding, fully paid and non assessable and of which nine thousand (9,000) shares are authorized but unissued, and (ii) one hundred thousand (100,000) shares of non-voting (Class B) Common Stock, no par value, of which nine thousand (9,000) shares are duly and validly issued, outstanding, fully paid and non assessable and of which ninety one thousand (91,000) shares are authorized but unissued. The authorized capital stock of Jamegy WV consists of ten thousand (10,000) shares of Common Stock, no par value, of which one hundred (100) shares are duly and validly issued, outstanding, fully paid and non assessable and of which nine thousand nine hundred (9,900) shares are authorized but unissued. Except as set forth on Schedule 2.2(a), there are no outstanding options, warrants, rights, commitments, preemptive rights or agreements of any kind for the issuance or sale of, or outstanding securities convertible into, any additional shares of capital stock of any class of Seller.

(b)    The shares of Common Stock of Jamegy are owned by the Stockholders in the amounts set forth on Schedule 2.2(b). Jamegy owns all of the issued and outstanding stock of Jamegy WV.

(c)    Except for Jamegy's ownership of Jamegy WV, no Seller owns or controls, directly or indirectly, any interest in any other Person. No Seller has made any investment and no Seller holds any interest in or has any outstanding loan or advance to or from, any person, including, without limitation, any officer, director or stockholder of any Seller.

11

**2.3.    Title to Assets.** Seller has good and valid title to the Assets other than the Know-How (and to Seller's knowledge, to the Know-How), free and clear of any Claims, except for (i) liens of public record with respect to the Seller Facilities and the equipment lien described in Schedule 2.3, and (ii) minor liens and encumbrances that have arisen in the ordinary course of business and that do not materially detract from the value of the Asset(s) subject thereto (*"Permitted Liens"*). The Assets are sufficient to permit Purchaser to operate and conduct the Business following the Closing as presently conducted by Seller.

**2.4.    Intellectual Property.**

(a)    Each item of Seller Intellectual Property, including the Patents is owned solely by Seller. Seller has made available to Purchaser copies of the Patents. To Seller's knowledge, there are no intellectual property rights owned or controlled by any third party necessary to make, use, sell, offer for sale and import the Products, as they currently exist or are reasonably expected to exist in the future, other than those intellectual property rights to be transferred to Purchaser pursuant to this Agreement or any of the Transfer Agreements. Seller is not aware of any infringement of any intellectual property rights of any Person by Seller or any affiliated prior owner of any Seller Intellectual Property, and except as set forth on Schedule 2.4(a), Seller is not aware of any claim of infringement of any intellectual property rights of any Person arising out of the development, manufacture, use, sale, offer for sale or import of the Products by Seller.

(b)    Seller has not granted any Person a license that is currently in effect under any of the Patents for any purpose, nor is Seller aware of the existence of any such license.

(c)    None of the Patents is involved in any interference or opposition proceeding, and, to Seller's knowledge, no such proceeding is being threatened with respect to any of the Patents.

(d)    Except as set forth on Schedule 2.4(d), Seller has not disclosed any Know-How including trade secrets of Seller included in the Know-How except to professional and technical employees and consultants who have executed written confidentiality agreements governing the use or disclosure of such trade secrets, and to Seller's knowledge, no such Know-How has been disclosed by any Person, except to the extent Seller disclosed such information in connection with making filings related to any Assets or Products with governmental or regulatory authorities.

(e)    Except as set forth on Schedule 2.4(e), Seller has required all professional and technical employees and consultants who provided services to Seller in connection with the Products, the Patents or the Know-How to execute agreements under which such employees were required to convey to Seller ownership of all inventions and developments conceived or created by them in the course of their employment with Seller, and to Seller's knowledge, all such inventions and developments have been disclosed to Seller. To Seller's knowledge, none of the activities of Seller's professional and technical employees and consultants who are providing services to Seller in connection with the Products, the Patents and the Know-How is violating any agreement between any such employees and their former employers.

12

(f)     The Seller Intellectual Property included in the Assets represents all of the intellectual property rights and assets necessary for Purchaser to conduct the Business following the Closing as presently conducted by Seller or contemplated to be conducted by Seller in the near future.

(g)     All of the Seller's Patents, Marks and Copyrights which are issued by, pending in, or registered with, as applicable, the U.S. Patent and Trademark Office, the U.S. Copyright Office or in any similar office or agency anywhere in the world are currently in compliance with formal legal requirements (including without limitation, as applicable, payment of filing, examination and maintenance fees, proofs of working or use, timely post-registration filing of affidavits of use and incontestability and renewal applications).

## 2.5.     Contracts; Real Property; Equipment.

(a)     Seller has made available to Purchaser true and correct copies of each of the contracts identified on Schedule 2.5(a). Except as set forth on Schedule 2.5(a), Seller is not a party or subject to or bound by: (i) any contract, agreement, or lease (whether written or oral and whether express or implied) involving a potential commitment or payment by or to Seller in excess of $50,000; (ii) any material contract, agreement, or lease (whether written or oral and whether express or implied) which is not cancelable by Seller without penalty on not less than sixty (60) days' notice; (iii) any contract, agreement, or lease (whether written or oral and whether express or implied) containing covenants which directly or explicitly limit in any respect the freedom of Seller to compete in any line of business or with any Person; (iv) any material contract, agreement, or lease (whether written or oral and whether express or implied) relating to the licensing, distribution, development, purchase, sale or servicing of its Products or any Seller Intellectual Property except in the ordinary course of business consistent with past practices; (v) any agreement, contract, indenture, mortgage, deed of trust, promissory note, loan agreement, guaranty or other agreement or commitment for borrowing or any pledge or security arrangement; (vi) any pension, profit sharing, retirement, stock option or bonus plan or agreement; (vii) any royalty, dividend or similar arrangement based on the revenues or profits of Seller or any contract or agreement involving fixed price or fixed volume arrangements; (viii) any joint venture, partnership, manufacturer, development or supply agreement or other agreement which involves a sharing of revenues, profits, losses, costs or liabilities by Seller with any other Person; (ix) any acquisition, merger or similar agreement; (x) any collective bargaining agreement or other agreement with any labor union or other employee representative of a group of employees; (xi) any contract, agreement, or lease (whether written or oral and whether express or implied) with any governmental entity; (xii) any contract, agreement or lease not executed in the ordinary course of business; or (xiii) any other material contract, agreement, or lease (whether written or oral and whether express or implied). Each contract identified on Schedule 2.5(a) is valid and in full force and effect, and constitutes a legal, valid and enforceable obligation of Seller that is a party thereto and is enforceable in accordance with its respective terms, subject to bankruptcy, insolvency, moratorium, or other similar laws affecting or relating to creditors' rights generally and general principles of equity. Seller is not in material breach of any contract identified on Schedule 2.5(a), and, to Seller's knowledge, no other party to any such contract is in material breach of such contract. Seller has no knowledge of any notice or threat to terminate or modify in any material respect any such contracts, agreements or leases set forth on Schedule 2.5(a).

(b)      The premises of the Seller Facilities is described on Schedule 2.5(b). Seller enjoys peaceful and undisturbed possession of such premises, and has adequate rights of ingress and egress to and from the Seller Facilities.  With respect to such real property that is owned by Seller (the *"Owned Real Property"*), except as set forth on Schedule 2.5(b): (i) Seller has good, valid, insurable fee simple title to the Owned Real Property, free and clear of all Claims except for matters described in clause (i) of Permitted Liens; (ii) no portion of the Owned Real Property is subject to any leases, rights of first refusal or options to purchase; (iii) all of the Owned Real Property has access to a public way and utility services sufficient to satisfy the practical needs of the Owned Real Property as currently used and improved; (iv) Seller has not received written notice of any actions, suits or proceedings (including, without limitation, condemnation or eminent domain proceedings) affecting all or any portion of the Owned Real Property or Seller's interest therein, nor, to the knowledge of Sellers, are any such actions, suits or proceedings (including, without limitation, condemnation or eminent domain proceedings) overtly threatened affecting all or any portion of the Owned Real Property or Seller's interest therein; (v) Seller has not received written notice of any violation of any Legal Requirement with respect to the Owned Real Property and (vi) to Seller's knowledge, there are no material defects in the physical condition of any improvements constituting part of the Owned Real Property, all of which are in good operating condition and repair (ordinary wear and tear excepted).  With respect to the real property at the Missouri Facility that is leased by Seller:  (i) the contracts identified on Schedule 2.5(a) include the real property lease as currently in effect (including all amendments thereto, the *"Lease"*) pursuant to which Seller has the right to occupy the Missouri Facility, and except for the Lease, there are no other leases or rental agreements pertaining to the occupancy by Seller of the Seller Facilities; (ii) the Lease is in full force and effect, and Seller has not received written notice that it is in default under the Lease and to Seller's knowledge no circumstances presently exist which, with notice or the passage of time, or both, would give rise to a default by Seller or the landlord; (iii) all security deposits required to be made by Seller under such Lease have been made by Seller, and no portion of such security deposits has been applied to any default by Seller under such Lease; (iv) Seller has the right to occupy the Missouri Facility in accordance with the terms of such Lease and has a valid and enforceable leasehold interest in the Leased Real Property, subject to bankruptcy, insolvency, moratorium, or other similar laws affecting or relating to creditors' rights generally and general principles of equity; and (v) Seller has not encumbered, assigned, granted any option or rights with respect to or sublet all or any portion of its rights under the Lease.

(c)      Schedule 2.5(c) accurately identifies all material equipment, materials, prototypes, tools, supplies, vehicles, furniture, fixtures, improvements and other material tangible assets owned by the Seller.  Schedule 2.5(c) also accurately identifies all material tangible assets leased to the Seller.  Each asset identified or required to be identified in Schedule 2.5(c): (i) is in good condition and repair, except as set forth on Schedule 2.5(c) (ordinary wear and tear excepted); (ii) complies in all material respects with, and is being operated and otherwise used in substantial compliance with, all applicable Legal Requirements; and (iii) is adequate and appropriate for the uses to which it is being put.

(d)      Seller has disclosed herein, made available to Purchaser in a Schedule furnished herewith, provided directly to Purchaser and its advisers or made available in the online data room in the course of Purchaser's due diligence investigation all material information

14

in possession of Seller or its Affiliates regarding the equipment, fixtures and furnishings that are owned by Seller and/or located at the Seller Facilities.

**2.6.    Compliance with Legal Requirements; Environmental Matters.**

(a)    Except as set forth on Schedule 2.6(a)(i), since September 1, 2001, Seller is and has at all times been in compliance in all material respects with all Legal Requirements relating to Seller, the use of the Assets and the operation of the Business. Seller has not received any written notice from any governmental body alleging any failure to comply with any Legal Requirement relating to the use of the Assets, the operation of the Business and the employment of the Employees. Seller holds all material registrations, permits, licenses and approvals issued by or on behalf of any federal, state or local government body that are required for the ownership of the Assets and the operation of the Business (the "*Permits*"), other than Environmental Permits (as defined below), all of which Permits are valid and in full force and effect, and Seller is in compliance in all material respects with the terms and conditions of such Permits. Schedule 2.6(a)(ii) lists all Permits, all of which will be assigned or otherwise transferred to Purchaser at the Closing, to the extent assignable or otherwise transferable.

(b)    Except as set forth on Schedule 2.6(b), since September 1, 2001, Seller has been in compliance in all material respects with all Environmental Laws applicable to the Assets, the Seller Facilities and Seller's operation of the Business. To Seller's knowledge, no event has occurred or condition exists or has existed which would reasonably be expected to give rise to liability on the part of Seller or Purchaser pursuant to, or to materially impair Seller's or Purchaser's compliance with, any Environmental Law applicable to the Assets, the Seller Facilities or the operation of the Business. The Seller Facilities have not been listed or, to Seller's knowledge, proposed for listing on the National Priorities List established by the United States Environmental Protection Agency, or any similar federal or state list. No material lien has attached to any of Seller's property or the Seller Facilities pursuant to any Environmental Law.

(c)    Except as set forth on Schedule 2.6(c), there has not been any action taken by Seller, operating practice by Seller or failure by Seller to act that could reasonably be expected to result in material liability under any Environmental Law or require remedial or corrective action, removal, monitoring or closure pursuant to any Environmental Law that results in material cost to Purchaser. Seller has not received any written notice from any governmental body or third party alleging any actual or threatened liability or obligation with respect to the Seller, the Assets, the Business, or the Seller Facilities, including as a result of:

(i)    the handling, storage, use, presence, transportation or disposal or arranging for transportation or disposal of any Hazardous Substance by Seller in, on, under, near, at or from the Seller Facilities or in connection with the Assets or the Business;

(ii)    any emission, discharge or release of any Hazardous Substance by Seller on, under, near, at or from the Seller Facilities or in connection with the Assets or the Business into or upon the air, surface water, ground water or land, including natural resource damage;

15

      **(iii)**    any disposal, handling, manufacturing, processing, distribution, use, treatment or transport of any Hazardous Substances by Seller on, under, near, at or from the Seller Facilities or in connection with the Assets or the Business; or

      **(iv)**    the presence of any Hazardous Substances in, under, near, at on, or from the Seller Facilities.

    **(d)**    Seller holds all material registrations, permits, licenses and approvals issued by or on behalf of any federal, state or local government body that are required pursuant to any Environmental Laws for the occupancy of and the conduct of business at the Seller Facilities, the ownership of the Assets, and the operation of the Business (**"*Environmental Permits*"**).  Any such Environmental Permits held by Seller are currently in full force and effect, and Seller is and has been in compliance in all material respects with all terms and conditions of such Environmental Permits, and with all other applicable limitations, restrictions, conditions, standards, prohibitions, requirements, obligations, schedules and timetables contained in Environmental Laws.  All of such Environmental Permits will be assigned or otherwise transferred to Purchaser at the Closing, to the extent assignable or otherwise transferable.

    **(e)**    To Seller's knowledge, no underground storage tanks or surface impoundments exist at the Seller Facilities.

    **(f)**    Except as set forth on <u>Schedule 2.6(f)</u>, Seller has not, either expressly, by operation of law, by Environmental Law or otherwise assumed, succeeded to or undertaken any liability or corrective, investigatory or remedial obligation of any other Person under any Environmental Laws.

    **(g)**    Seller has made available to Purchaser copies of any environmental reports, assessments, studies, investigations, audits, Environmental Permits, licenses, registrations and other environmental, health or safety documents relating to the Assets, the Seller Facilities and the Business that are in Seller's possession or control.

    **2.7.**    **Absence of Certain Changes.**  Since the date of the Base Balance Sheet (as defined below), Seller has conducted its business only in the ordinary course consistent with past practice and, except as set forth in <u>Schedule 2.7</u>, since such date there has not been:

    **(a)**    Any material change in the financial condition, properties, assets, liabilities, business or operations of Seller;

    **(b)**    Any contingent liability incurred by Seller as guarantor or otherwise with respect to the obligations of others or any cancellation of any material debt or claim owing to, or waiver of any material right of, Seller;

    **(c)**    Any mortgage, encumbrance or lien placed on any of the properties of Seller which remains in existence on the date hereof or will remain on the Closing Date, other than Permitted Liens;

(d)    Any purchase, sale or other disposition, or any agreement or other arrangement for the purchase, sale or other disposition, of any of the properties or assets of Seller, other than in the ordinary course of business;

(e)    Any damage, destruction or loss, whether or not covered by insurance, materially and adversely affecting the properties, Assets or Business;

(f)    Any actual or, to Seller's knowledge, threatened employee strikes, work stoppages, slowdowns or lockouts or claim of unfair labor practices involving Seller; any labor union organizing activity to Seller's knowledge; or any change in the rate of compensation, commission, bonus, retention or other compensation, retirement, welfare, fringe or severance benefit, vacation pay or other direct or indirect remuneration payable, or paid or agreed or promised to pay (in either case in writing or orally), conditionally or otherwise, to or in respect of any director, officer, employee, agent or independent contractor of the Business, in each case other than increases in the ordinary course of business;

(g)    Any change in employment with respect to the officers of Seller;

(h)    Any loss of any significant supplier, customer, distributor or account of any Seller;

(i)    Any amendment or termination of any material contract or agreement to which Seller is a party or by which it is bound, except for the expiration of any such contract or agreement in accordance with its terms;

(j)    Any entering into, amendment, modification or renewal of any employment, consulting, change in control, severance, retention or similar contract, agreement or arrangement with any director, employee, officer or other service provider of the Business, except to make changes that are required by applicable law or the terms of an Employee Program (as defined below);

(k)    Any establishment, entering into or adoption of any Employee Program or collective bargaining agreement or amendment to any Employee Program (other than as required to comply with applicable law), or any waiver of Seller's material rights under, or permitted or provided for the acceleration of vesting or payment under, any provision of any Employee Program;

(l)    Any payment or discharge of a material lien or liability of Seller which was not shown on the Base Balance Sheet or incurred in the ordinary course of business thereafter;

(m)    Any obligation or liability incurred by Seller to any of its officers, directors, stockholders or employees, or any loans or advances made by Seller to any of its officers, directors, stockholders or employees, except normal compensation and expense allowances payable to officers or employees;

(n)    Any change in accounting methods or practices, credit practices or collection policies used by Seller; or

17

**(o)**    Any agreement or understanding whether in writing or otherwise, for Seller to take any of the actions specified in paragraphs (a) through (n) above.

## 2.8.    Regulatory Matters.

**(a)**    The Regulatory Filings are current and in full force and effect and include all regulatory filings and governmental registrations made by or issued to Seller that relate specifically to the Products. Seller has made available to Purchaser copies of all governmental correspondence (including copies of official notices, citations or decisions) in Seller's files relating to the Regulatory Filings.

**(b)**    Except as set forth on <u>Schedule 2.8(b)</u>, since September 1, 2001 Seller has been in compliance in all material respects with all Legal Requirements applicable to the development, manufacture, labeling, testing and inspection of the Products (at the Seller Facilities and otherwise), including, if applicable, the California Toxic Enforcement Act of 1986 (Proposition 65), and the operation of manufacturing facilities used to manufacture the Products, and with all applicable regulations, policies and procedures promulgated by the applicable governmental authorities with respect thereto.

## 2.9.    Employee Matters; ERISA.

**(a)**    <u>Schedule 2.9(a)</u> sets forth a true and complete list of all "employee benefit plans" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended (*"ERISA"*), and any other plans, agreements, policies, trust funds or arrangements (whether written or unwritten, insured or self-insured) (i) established, maintained, sponsored or contributed to (or with respect to which any obligation to contribute has been undertaken) by Seller or any entity that would be deemed a "single employer" with Seller or any of its subsidiaries under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA (each, an *"ERISA Affiliate"*) on behalf of any employee, officer, director, stockholder or other service provider of the Business (whether current, former or retired) or their beneficiaries, or (ii) with respect to which the Seller, the Business or any ERISA Affiliate has or has had any obligation on behalf of any such employee, officer, director, stockholder or other service provider or beneficiary (each an *"Employee Program"* and, collectively, the *"Employee Programs"*).

**(b)**    Seller has made available to Purchaser: (i) copies of all material documents setting forth the terms of each Employee Program, including all amendments thereto and all related trust documents; (ii) the three most recent annual reports (Form Series 5500), if any, required under ERISA or the Code in connection with each Employee Program; (iii) the most recent summary plan description, if any, required under ERISA with respect to each Employee Program; (iv) all material written contracts, instruments or agreements relating to each Employee Program, including administrative service agreements and group insurance contracts; and (v) the most recent Internal Revenue Service (*"IRS"*) determination or opinion letter issued with respect to each Employee Program intended to be qualified under Section 401(a) of the Code.

18

(c)    Neither Seller nor any ERISA Affiliate or any of their respective predecessors has ever contributed to, contributes to, has ever been required to contribute to, or otherwise participated in or participates in or in any way, directly or indirectly, has any liability with respect to any plan subject to Section 412 of the Code, Section 302 of ERISA or Title IV of ERISA, including, without limitation, any "multiemployer plan" (within the meaning of Sections 3(37) or 4001(a)(3) of ERISA or Section 414(f) of the Code) or any single employer pension plan (within the meaning of Section 4001(a)(15) of ERISA) which is subject to Sections 4063, 4064 or 4069 of ERISA.

(d)    With respect to each of the Employee Programs:  (i) each Employee Program intended to qualify under Section 401(a) of the Code is qualified and has received a determination letter from the IRS upon which it may rely regarding its qualified status under the Code for all statutory and regulatory changes with respect to plan qualification requirements for which the IRS will issue such a letter and nothing has occurred, whether by action or by failure to act, that caused or could cause the loss of such qualification or the imposition of any penalty or tax liability; (ii) all payments required by the Employee Program, any collective bargaining agreement or other agreement, or by law (including, without limitation, all contributions, insurance premiums or intercompany charges) with respect to all prior periods have been made or provided for by Seller in accordance with the provisions of each of the Employee Programs, applicable law and generally accepted accounting principals; (iii) no proceeding has been threatened, asserted, instituted or, to the knowledge of Seller, is anticipated against any of the Employee Programs (other than routine claims for benefits and appeals of such claims), any trustee or fiduciaries thereof, any ERISA Affiliate, any employee, officer, director, stockholder or other service provider of the Business (whether current, former or retired), or any of the assets of any trust of any of the Employee Programs; (iv) each Employee Program complies in form and has been maintained and operated in all respects in accordance with its terms and applicable law, including, without limitation, ERISA and the Code; (v) no non-exempt "prohibited transaction," within the meaning of Section 4975 of the Code and Section 406 of ERISA, has occurred or is reasonably expected to occur with respect to the Employee Programs; (vi) no Employee Program is under, and neither the Seller nor any of its subsidiaries have received any notice of, an audit or investigation by the IRS, Department of Labor or any other governmental authority and no such completed audit, if any, has resulted in the imposition of any tax or penalty; (vii) with respect to each Employee Program that is funded mostly or partially through an insurance policy, neither Seller nor any ERISA Affiliate has any liability in the nature of retroactive rate adjustment, loss sharing arrangement or other actual or contingent liability arising wholly or partially out of events occurring on or before the date of this Agreement or is reasonably expected to have such liability with respect to periods through the Closing Date; and (viii) no Employee Program provides post-retirement benefits, except as required under Section 4980B of the Code, Part 6 of Title I of ERISA or any other applicable law.

(e)    Except as may be provided for under the terms of each Employee Program, the consummation of the transactions contemplated by this Agreement alone, or in combination with a termination of any employee, officer, director, stockholder or other service provider of the Business (whether current, former or retired) or their beneficiaries, will not give rise to any liability under any Employee Program, including, without limitation, liability for severance pay, unemployment compensation, termination pay or withdrawal liability, or accelerate the time of payment or vesting or increase the amount of compensation or benefits due

19

to any employee, officer, director, stockholder or other service provider of the Business (whether current, former or retired) or their beneficiaries. No amount that could be received (whether in cash or property or the vesting of property), as a result of the consummation of the transactions contemplated by this Agreement, by any employee, officer, director or other service provider or stockholder of the Business who is a "disqualified individual" (as such term is defined in Treasury Regulations Section 1.280G–1) under any Employee Program or otherwise could be characterized as an "excess parachute payment" (as defined in Section 280G(b)(1) of the Code).

        **(f)**    None of Seller, any ERISA Affiliate, any employee, officer, director, stockholder or other service provider of the Business has made any promises or commitments, that could legally bind Seller to create any additional plan, agreement or arrangement, or to modify or change in any material way any existing Employee Program.

        **(g)**    Neither Seller nor any of its subsidiaries has unfunded liabilities pursuant to any Employee Program that is not intended to be qualified under Section 401(a) of the Code and is an "employee pension benefit plan" within the meaning of Section 3(2) of ERISA, a nonqualified deferred compensation plan or an excess benefit plan. Each Employee Program that is a "nonqualified deferred compensation plan" (as defined under Section 409A(d)(1) of the Code) has been operated and administered in good faith compliance with Section 409A of the Code from the period beginning January 1, 2005 through the date hereof and has not been materially modified since October 2, 2004.

        **(h)**    Any individual who performs material services for the Business and who is not treated as an employee for federal income tax purposes by Seller is not an employee of Seller under applicable law or for any purpose including, without limitation, for tax withholding purposes or Employee Program purposes.

        **(i)**    Seller is not a party to or bound by any collective bargaining agreement and there are no labor unions or other organizations representing, purporting to represent or attempting to represent any employees of the Business. Since January 1, 2001 there has not occurred or, to the knowledge of Seller, been threatened any strike, slowdown, picketing, work stoppage, concerted refusal to work overtime or other similar labor activity with respect to any employees of the Business. There are no labor disputes currently subject to any grievance procedure, arbitration or litigation and there is no representation petition pending or, to the knowledge of Seller, threatened with respect to any employee of the Business. Seller has not and are not engaged in any unfair labor practices within the meaning of the National Labor Relations Act with respect to the Business. Seller is in compliance in all material respects with all applicable laws relating to employment and employment practices, workers' compensation, terms and conditions of employment, worker safety, wages and hours, civil rights, discrimination, immigration, collective bargaining, and the Worker Adjustment and Retraining Notification Act. Except as set forth in Schedule 2.9(i), there have been no written or overt claims of harassment, discrimination, retaliatory act or similar actions against any officer, director or employee of the Business at any time during the past four years and, to the knowledge of Seller, no facts exist that could reasonably be expected to give rise to such claims or actions.

    **2.10.**    **Certain Liabilities.** Seller has no material liabilities or obligations other than (i) liabilities to perform in the ordinary course under or relating to the Contracts, whether or not

material, (ii) liabilities incurred in the ordinary course of business consistent with past practices since the date of the Base Balance Sheet and which are not material, (iii) liabilities referred to in, or relating to matters referred to in, Schedule 2.10, and (iv) liabilities set forth in the Financial Statements.

**2.11.    Legal Proceedings.**  Schedule 2.11 includes a description of all litigation, claims, and proceedings or, to the knowledge of Seller, investigations involving any Seller or any of its officers, directors, managers, equity holders or key employees in connection with the Business of Seller occurring, arising or existing during the past three (3) years.  Except as set forth on Schedule 2.11, there is no litigation or governmental or administrative proceeding or investigation pending or, to the knowledge of Seller, threatened against Seller or affecting the properties or assets of Seller or the Business, or, as to matters related to the Business conducted by Seller, against any officer, director, manager, equity holder or key employee of Seller in their respective capacities in such positions, nor, to the knowledge of Seller, has there occurred any event nor does there exist any condition on the basis of which any such claim may be asserted.

**2.12.    Suppliers.**  Schedule 2.12: (i) provides an accurate and complete breakdown and aging of the accounts payable of Seller as of the date of this Agreement; (ii) provides an accurate and complete breakdown of any customer deposits or other deposits held by Seller as of the date of this Agreement; and (iii) provides an accurate and complete breakdown of all notes payable and other indebtedness for borrowed money of Seller (*"Indebtedness"*) as of the date of this Agreement.  Schedule 2.12 accurately identifies, and provides an accurate and complete breakdown of the amounts paid to, each supplier or other Person that (together which such Person's Affiliates) shipped or otherwise made available for delivery (i) more than fifty thousand (50,000) pounds in the aggregate to Seller in 2003, 2004 or 2005, or (ii) more than ten thousand (10,000) pounds in the aggregate to Seller in the first nine months of 2006 (each such Person, a *"Supplier"*).  To Seller's knowledge, the relationships of Seller with its Suppliers are good commercial working relationships.  Except as set forth in Schedule 2.5(a), no Supplier has cancelled, materially modified, or otherwise terminated its relationship with Seller, or has during said period decreased materially its services, supplies or materials furnished to Seller, nor does any Supplier have, to the knowledge of Seller, any plan or intention to do any of the foregoing.

**2.13.    Receivables.**  Schedule 2.13 provides an accurate and complete breakdown and aging of all accounts receivable, notes receivable and other receivables of the Seller as of November 30, 2006.  Except as set forth in Schedule 2.13, all of the accounts receivable of Seller are valid and enforceable claims and not subject to any set-off or counterclaim, and are, to Seller's knowledge, fully collectible in the normal course of business.  Since the date of the Base Balance Sheet, Seller has collected its accounts receivable in the ordinary course of business and in a manner which is consistent with past practices and has not accelerated any such collections.  Seller has no accounts receivable from any of its Affiliates or any Affiliate of its directors, officers, employees or stockholders.

**2.14.    Customers; Distributors.**  Schedule 2.14 provides an accurate and complete breakdown of the revenues received from each customer or other Person that (together with such customer's or other Person's affiliates) accounted for (i) more than two hundred thousand dollars $200,000 of the gross revenues of the Seller in 2003, 2004 or 2005, or (ii) more than one hundred thousand $100,000 of the gross revenues of the Seller in the first nine months of 2006.

Except as set forth in Schedule 2.7, Seller has not received any written notice or other communication indicating that any customer or other Person identified or required to be identified in Schedule 2.14 may cancel, materially modify or otherwise terminate its relationship with Seller. Seller has not received any written notice or other overt communication indicating that any distributor of any of the Seller's products may cancel, materially modify or otherwise terminate its relationship with Seller.

2.15.   **Inventory.** Schedule 2.15 provides an accurate and complete breakdown of all inventory (including raw materials, work in process, inventories in transit and finished goods) of Seller as of the Closing Date. All of Seller's existing inventory (i) is of such quality and quantity as to be usable and saleable by the Seller in the ordinary course of business consistent with Seller's past practices, (ii) is of similar quality and quantity as materials held in inventory over the course of the year immediately preceding the Closing Date, (iii) has been priced at cost using the average cost method in accordance with GAAP, and (iv) is not excessive in light of the Seller's normal operating requirements. All raw materials and in-process materials are located on either the Leased Real Property or the Owned Real Property. All final product is located on either the Owned Real Property or in one of the locations identified on Schedule 2.15. Since the date of the Base Balance Sheet, no inventory items have been sold or disposed of except through sales in the ordinary course of business at profit margins consistent with Seller's historical results, and all sales commitments made for Seller's products are at prices not less than inventory values plus selling expenses at profit margins consistent with Seller's historical results.

2.16.   **Authority; Binding Nature of Agreement.** Seller has all necessary power and authority to execute and deliver this Agreement and each agreement, document and instrument executed and delivered in connection herewith (including without limitation the Transfer Agreements) (the *"Ancillary Agreements"*) and to perform its obligations hereunder and thereunder; and the execution, delivery and performance by Seller of this Agreement and each of the Ancillary Agreements has been duly authorized by all necessary action on the part of Seller, its board of directors and stockholders. Seller has provided to Purchaser a copy of the resolutions of the board of directors and the consent of the shareholders of Seller authorizing the execution, delivery and performance by Seller of this Agreement and each of the Ancillary Agreements and no further approvals are required. This Agreement constitutes, and, upon execution thereof, each of the Ancillary Agreements will constitute, the valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject to laws of general application relating to bankruptcy, insolvency and the relief of debtors, and rules of law governing specific performance, injunctive relief and other equitable remedies.

(b)     Each Stockholder has all right, authority, power and capacity to execute and deliver this Agreement and each Ancillary Agreement to be executed and delivered by or on behalf of him or her pursuant to this Agreement and to perform his or her obligations under this Agreement and each of the Ancillary Agreements. This Agreement constitutes, and, upon execution thereof, each of the Ancillary Agreements to which such Stockholder becomes a party, will constitute, the valid and binding obligation of each Stockholder, enforceable against such Stockholder in accordance with its terms, subject to laws of general application relating to bankruptcy, insolvency and the relief of debtors and rules of law governing specific performance, injunctive relief and other equitable remedies.

**2.17.    Non-Contravention; Consents.**Except for the Required Consents (as defined below), the execution and delivery by Seller of this Agreement and the Ancillary Agreements and the performance of Seller's obligations hereunder and thereunder does not and will not:  (i) conflict with, contravene or result in a material violation or breach of any Legal Requirement applicable to Seller or the Assets; (ii) create or result in the imposition of any material Claim upon any of the Assets, (iii) conflict with, contravene or result in a material violation or breach of, or give rise to a right of termination under, any material Contract or (iv) conflict with, contravene or result in a violation of Seller's Articles of Incorporation or Bylaws.  Except for the Consents set forth on Schedule 2.17 (the *"Required Consents"*), Seller is not and will not be required to obtain any Consent from any Person in connection with the execution, delivery or performance of this Agreement or any of the Ancillary Agreements or the consummation of any of the transactions contemplated hereby or thereby.

(b)    The execution and delivery by each Stockholder of this Agreement and the Ancillary Agreements to be executed and delivered thereby, and the performance of such Stockholder's obligations hereunder and thereunder does not and will not:  (i) conflict with, contravene or result in a material violation or breach of any Legal Requirement applicable to such Stockholder, his or her properties and assets, or the Assets; (ii) create or result in the imposition of any material Claim upon any of the Assets, or (iii) conflict with, contravene or result in a material violation or breach of, or give rise to a right of termination under, any material contract or agreement under which such Stockholder is bound.  Except for the Required Consents, such Stockholder is not and will not be required to obtain any Consent from any Person in connection with the execution, delivery or performance of this Agreement or any of the Ancillary Agreements or the consummation of any of the transactions contemplated hereby or thereby.

**2.18.    Financial Statements.**

(a)    Seller has delivered to Purchaser the following financial statements, copies of which are attached hereto as Schedule 2.18(a) (the *"Financial Statements"*):

(i)    Consolidated Balance sheets of Seller for its last three (3) fiscal years ending on December 31 and statements of income, retained earnings and cash flows for the three (3) years then ended, with appropriate footnotes, certified by Michael G. DiDomenico, CPA, an independent public accountant.

(ii)    A consolidated balance sheet of Seller as of November 30, 2006 (herein the *"Base Balance Sheet"*) and consolidated statements of income, retained earnings and cash flows for the period then ended, with appropriate footnotes, certified by Seller's chief executive officer.

(b)    Said Financial Statements have been prepared in accordance with GAAP applied consistently during the periods covered thereby, are complete and correct in all material respects, and present fairly in all material respects the financial condition of Seller at the dates of said statements and the results of its operations and its cash flows for the periods covered thereby.

23

(c)     The projections previously provided to Purchaser and attached hereto as Schedule 2.18(c) represent good faith estimates of the performance of Seller for the periods stated therein based upon assumptions which were believed in good faith to be reasonable when made and continue to be reasonable as of the date hereof; provided, however, that the foregoing does not constitute a representation, warranty or affirmative statement that such projections will be achieved.

## 2.19.   Taxes.

(a)     Seller has paid or caused to be paid all federal, state, local, foreign, and other taxes, including, without limitation, income taxes, estimated taxes, alternative minimum taxes, excise taxes, sales taxes, use taxes, value added taxes, gross receipts taxes, franchise taxes, capital stock taxes, employment and payroll related taxes, withholding taxes, stamp taxes, transfer taxes windfall profit taxes, environmental taxes and property taxes, whether or not measured in whole or in part by net income, and all deficiencies, or other additions to tax, interest, fines and penalties owed by it (collectively, *"Taxes"*), required to be paid by it through the date hereof whether disputed or not.

(b)     Seller has in accordance with applicable law filed all federal, state, local and foreign tax returns required to be filed by it through the date hereof, and all such returns correctly and accurately set forth the amount of any Taxes relating to the applicable period. A list of all federal, state, local and foreign income tax returns filed with respect to Seller for taxable periods ended on or after the end of fiscal year 2003 is set forth in Schedule 2.19(b) attached hereto, and said Schedule indicates those returns that have been audited or currently are the subject of an audit.  Seller has delivered to Purchaser correct and complete copies of all federal, state, local and foreign income tax returns listed on said Schedule, and of all examination reports and statements of deficiencies assessed against or agreed to by Seller with respect to said returns.

(c)     Neither the Internal Revenue Service nor any other governmental authority is now asserting or, to the knowledge of Seller, threatening to assert against Seller any deficiency or claim for additional Taxes.  No claim has ever been made by an authority in a jurisdiction where Seller does not file reports and returns that Seller is or may be subject to taxation by that jurisdiction.  There are no security interests on any of the assets of Seller that arose in connection with any failure (or alleged failure) to pay any Taxes.  Seller has never entered into a closing agreement pursuant to Section 7121 of the Internal Revenue Code of 1986, as amended (the *"Code"*).

(d)     There has not been any audit of any tax return filed by Seller, no audit of any tax return of Seller is in progress, and Seller has not been notified by any tax authority that any such audit is contemplated or pending.  No extension of time with respect to any date on which a tax return was or is to be filed by Seller is in force, and no waiver or agreement by Seller is in force for the extension of time for the assessment or payment of any Taxes.

(e)     Seller has never been (and has never had any liability for unpaid Taxes because it once was) a member of an "affiliated group" (as defined in Section 1504(a) of the Code).  Seller has never filed, and has never been required to file, a consolidated, combined or

24

unitary tax return with any other entity. Except as set forth in Schedule 2.19(e), Seller does not own and has never owned a direct or indirect interest in any trust, partnership, corporation or other entity. Except as set forth in Schedule 2.19(e), Seller is not a party to any tax sharing agreement.

(f)    Seller is not a "foreign person" within the meaning of Section 1445 of the Code and Treasury Regulations Section 1.1445-2.

(g)    For purposes of this Agreement, all references to Sections of the Code shall include any predecessor provisions to such Sections and any similar provisions of federal, state, local or foreign law.

**2.20.    Transaction with Affiliates.** Except as set forth in Schedule 2.20, there are no loans, leases or other agreements or transactions between Seller and any of its equity holders or any present or former equity holder, manager, director, officer, employee or Affiliate of Seller, or to the knowledge of Seller, any Affiliate of any such Persons. No equity holder, director, manager, officer or employee of Seller, or to the knowledge of Seller any of its respective Affiliates, owns directly or indirectly, on an individual or joint basis, any interest in, or serves as an officer, employee, manager or director or in another similar capacity of, any competitor, customer or supplier of Seller, or any organization which has a material contract or arrangement with Seller.

**2.21.    Insurance.** The physical properties and assets of Seller are insured to the extent disclosed in Schedule 2.21 and all insurance policies and arrangements of Seller are disclosed in said Schedule. Except as set forth on Schedule 2.21, said insurance policies and arrangements are in full force and effect, all premiums with respect thereto are currently paid, and Seller is in material compliance with the terms thereof. To Seller's knowledge, said insurance is adequate and customary for the business engaged in by Seller. Each such insurance policy shall continue to be in full force and effect upon Purchaser's purchase of the Assets. Except as set forth on Schedule 2.21, there are currently no claims pending against Seller under any insurance policies currently in effect and covering the Assets, Business or Employees of Seller, and there are no outstanding claims which have been denied by the applicable insurance carrier. No insurance policies, or historical policy year limits with respect to said insurance policies, have been impaired.

**2.22.    Investment Banking; Brokerage.** Except for Duff & Phelps, LLC, the fees for which shall be paid by Seller at Closing, there are no claims for investment banking fees, brokerage commissions, broker's or finder's fees or similar compensation in connection with the transactions contemplated by this Agreement payable by Seller, any stockholder of Seller or any of their respective Affiliates or based on any arrangement or agreement made by or on behalf of Seller or any of Seller's Affiliates.

**2.23.    Warranty.** Schedule 2.23 sets forth a list representing the Product and service warranties and guarantees on any of the Products that Seller distributes, markets, sells or produces for itself, a customer or a third party. There are no existing or, to the knowledge of Seller, threatened, claims against Seller relating to any work performed by Seller, Product liability, warranty or other similar claims against Seller alleging that any Product is defective or

fails to meet any Product or service warranties or Product specifications. To the knowledge of Seller, there are no inherent design defects or systemic or chronic problems in any Product, all of which, to Seller's knowledge, are in compliance with applicable contractual commitments.

**2.24.    Disclosure.**  To Seller's knowledge, there are no facts which presently have or are reasonably likely to have in the future a material adverse affect on the business, properties, operations or condition of Seller, the Assets or the Business which have not been specifically disclosed herein, in a Schedule furnished herewith, provided directly to Purchaser and its advisers or made available in the online data room in the course of Purchaser's due diligence investigation, other than (i) general economic conditions affecting Seller's industry or (ii) any direct adverse effect resulting from the sale of Assets hereunder.

## 3.    REPRESENTATIONS AND WARRANTIES OF PURCHASER.

Purchaser represents and warrants to Seller as follows:

**3.1.    Due Organization.**  Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.

**3.2.    Compliance with Legal Requirements.**  Purchaser is in compliance in all material respects with all applicable Legal Requirements.

**3.3.    Legal Proceedings.**  There is no pending or, to Purchaser's knowledge, threatened lawsuit or other legal proceeding that could reasonably be expected to have a material adverse effect upon Purchaser's ability or authorization to consummate the transactions contemplated under this Agreement.

**3.4.    Authority; Binding Nature of Agreement.**  Purchaser has all necessary power and authority to execute and deliver this Agreement and the Ancillary Agreements, and to perform its obligations hereunder and thereunder; and the execution, delivery and performance by Purchaser of this Agreement and the each other Ancillary Agreements has been duly authorized by all necessary action on the part of Purchaser, its board of directors and shareholders. Purchaser has provided to Seller a copy of the resolutions of the board of directors and the consent of the shareholders of Purchaser authorizing the execution, delivery and performance by Purchaser of this Agreement and the Ancillary Agreements, and no further corporate approvals are required. This Agreement constitutes, and, upon execution thereof, each of the Ancillary Agreements to which Purchaser will be a party will constitute, the valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, subject to laws of general application relating to bankruptcy, insolvency and the relief of debtors, and rules of law governing specific performance, injunctive relief and other equitable remedies.

**3.5.    Non-Contravention; Consents.**  Assuming the consents set forth on Schedule 3.5 are obtained, the execution, delivery or performance of this Agreement and the Ancillary Agreements and the performance of Purchaser's obligations hereunder and thereunder does not and will not (a) conflict with or result in any violation of any provision of the certificate of incorporation, bylaws or other charter or organizational documents of Purchaser, (b) conflict with, contravene or result in a violation or breach by Purchaser under any material contract to which Purchaser is a party, or (c) conflict with, contravene or result in a violation or breach of

any Legal Requirement applicable to Purchaser. Except as set forth on Schedule 2.17, Purchaser is not and will not be required to obtain any Consent from any Person in connection with the execution, delivery or performance of this Agreement or any of the Ancillary Agreements or the consummation of any of the transactions contemplated hereby or thereby.

**4.     INDEMNIFICATION.**

**4.1.     Survival of Representations; Indemnification by Seller and the Stockholders.**

(a)     All Seller covenants contained in this Agreement and the Ancillary Agreements will survive the Closing in accordance with their terms.

(b)     The representations and warranties of Seller and the Stockholders set forth in Section 2 will survive the Closing but will terminate and expire, and will cease to be of any force or effect on the eighteen month anniversary of the Closing Date (the *"Indemnification Cut-Off Date"*) and all liability of Seller with respect to such representations and warranties will thereupon be extinguished; provided, however, that if, prior to such Indemnification Cut-Off Date, Purchaser shall have duly delivered to Seller, in conformity with all of the applicable procedures set forth in Section 4.4, a Claim Notice (as defined below) setting forth a claim for indemnification based upon a breach by Seller of any of such representations or warranties, then the specific claim set forth in such Claim Notice will survive (and will not be extinguished upon) the Indemnification Cut-Off Date; provided, further, that (i) any claim related to or based on fraud or intentional misrepresentation may be made at any time, and (ii) any claim with respect to a breach of a representation or warranty contained in Sections 2.3, 2.4(a), 2.9, 2.16 and 2.19 (the *"Specified Representations"*) may be made at any time prior to the expiration of the applicable statute of limitations.

(c)     Subject to the limitations set forth in this Section 4.1, from and after the Closing Date, Seller agrees to indemnify Purchaser, its Affiliates and direct and indirect partners (including partners of partners and stockholders and members of partners), members, stockholders, directors, officers, employees and agents and each person who controls any of them within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act, (collectively, the *"Purchaser Indemnified Parties"* and, individually, a *"Purchaser Indemnified Party"*) against any Damages that such Purchaser Indemnified Party incurs as a result of or relating to (i) any breach by Seller or the Stockholders of any of their representations and warranties in this Agreement and the Ancillary Agreements, (ii) any breach by Seller of any of its covenants in this Agreement and the Ancillary Agreements, and (iii) the Retained Liabilities. Without limiting the foregoing, each Stockholder agrees to indemnify each Purchaser Indemnified Party from and against any Damages that such Purchaser Indemnified Party incurs as a result of or relating to (x) the Specific Claims and (y) the December 2006 Fire (the *"Stockholder Indemnity"*). For the avoidance of doubt, but without limiting anything herein, with respect to the December 2006 Fire, "Damages" shall include, without limitation: (i) the actual costs and expenses associated with respect to building and equipment repair, replacement, clean up and refurbishment, and any other costs or expenses incurred to return the building and equipment in the area of the production building of the Seller Facilities affected by the December 2006 Fire to conditions substantially similar to those present immediately prior to such fire; (ii)

the actual costs and expenses incurred in connection with any action, investigation, lawsuit or other proceeding arising out of the December 2006 Fire; (iii) the amount of any fines, damages and awards imposed or assessed or levied by any federal, state or local governmental authority (including, without limitation, OSHA) (a "*Governmental Authority*") as a result of the December 2006 Fire; (iv) the costs and expenses to implement any changes to the Business and/or the Seller Facilities (A) required by any Governmental Authority (or an independent third party appointed thereby) and/or (B) recommended by a Consultant (as defined below), or any other consultant engaged by Purchaser with the consent of Seller, which consent shall not be unreasonably withheld, in accordance with Section 5.8 and which Purchaser and Seller in good faith after consultation with Purchaser's senior management mutually determine and agree in writing are commercially reasonable (without consideration of Purchaser's rights to indemnification hereunder in respect thereof) ("*Required Change Costs*"); and (v) the reasonable attorneys' and advisors' fees and expenses associated with any of the foregoing; provided, however, that it is understood and agreed that the amount of any Required Change Costs shall be calculated by including not only the amount of any capital expenditures and service expenses to effect such changes, but also the costs and expenses of any business interruption in connection therewith, and by taking into account the impact of such changes to the cost structure of the Business and the 6.5X multiple of EBITDA of the Business paid by Purchaser for the Business (and reflected in the amounts set forth in Section 1.4). Seller's and the Stockholder's obligation to indemnify such Purchaser Indemnified Parties pursuant to this Section 4.1(c) will not relieve Seller of, or alter in any way, Seller's obligation to fully satisfy all of Seller's liabilities other than the Assumed Liabilities.

(d)     Seller will not be required to indemnify any Purchaser Indemnified Party with respect to any breach by Seller of any of its representations and warranties in this Agreement and the Ancillary Agreements, except to the extent that the cumulative amount of the Damages actually incurred by such Purchaser Indemnified Parties as a result of all such breaches exceeds one million dollars ($1,000,000); provided, however, that the foregoing limitations shall not apply to claims for indemnification by a Purchaser Indemnified Party, and such claims shall not be included in any calculation made under this Section 4.1(d), in each case with respect to breaches of representation and warranty based on or relating to fraud or intentional misrepresentation.

(e)     Seller will not be required to indemnify any Purchaser Indemnified Party with respect to any Retained Liabilities (or with respect to any breach of covenant claim under Section 5.6(a) relating thereto) until the cumulative amount of the Damages actually incurred by such Purchaser Indemnified Parties as a result of all such Retained Liabilities exceeds two hundred fifty thousand dollars ($250,000) (the "*Retained Liabilities Threshold*"), and then Seller shall indemnify such Purchaser Indemnified Parties for the entire amount of such Damages; provided, however, that the foregoing Retained Liabilities Threshold shall not apply to claims for indemnification by a Purchaser Indemnified Party, and such claims shall not be included in any calculation made under this Section 4.1(e), with respect to the Retained Liabilities (or with respect to any breach of covenant claim under Section 5.6(a) relating thereto) set forth on Schedule 1.3(b).

(f)     The total amount of the indemnity payments that Seller may be required to make under or in connection with this Agreement with respect to breaches by it of the

28

representations and warranties in this Agreement and the Ancillary Agreements will be limited in the aggregate to the amount in the Escrow Fund at the time of such payment; provided, however, that the foregoing limitations shall not apply to claims for indemnification by a Purchaser Indemnified Party with respect to breaches of representation and warranty based on or relating to fraud, intentional misrepresentation or any Specified Representation.

(g)     The total amount of indemnity payments that a Stockholder may be required to make under or in connection with the Stockholder Indemnity will be limited to such Stockholder's pro rata share (based on such Stockholder's ownership in Jamegy as of the Closing) of the consideration paid to Seller under this Agreement. For the avoidance of doubt, any claims for indemnification made against the Stockholders pursuant to the Stockholder Indemnity shall be paid pro rata among all Stockholders based on such Stockholder's ownership in Jamegy as of the Closing.

## 4.2.    Indemnification by Purchaser.

(a)     All covenants of Purchaser set forth in Section 5, will terminate and expire, and will cease to be of any force or effect, on the Closing Date.

(b)     The representations and warranties of Seller set forth in Section 3 will survive the Closing but will terminate and expire, and will cease to be of any force or effect, at 10:00 a.m. (Eastern time) on the Indemnification Cut-Off Date and all liability of Purchaser with respect to such representations and warranties will thereupon be extinguished; provided, however, that if, prior to the Indemnification Cut-Off Date, Seller shall have duly delivered to Purchaser, in conformity with all of the applicable procedures set forth in Section 4.4, a Claim Notice setting forth a claim for indemnification based upon Purchaser's breach of any of such representations or warranties, then the specific claim set forth in such Claim Notice will survive (and will not be extinguished upon) the Indemnification Cut-Off Date;

(c)     Subject to the limitations set forth in this Section 4.2, from and after the Closing Date, Purchaser will indemnify Seller, its Affiliates and direct and indirect partners (including partners of partners and stockholders and members of partners), members, stockholders, directors, officers, employees and agents and each person who controls any of them within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act, (collectively, the *"Seller Indemnified Parties"* and, individually, an *"Seller Indemnified Party"*) against any Damages that such Seller Indemnified Party incurs as a result of or relating to (i) any breach by Purchaser of any of the representations and warranties of Purchaser in this Agreement and the Ancillary Agreements, (ii) any breach by Purchaser of Purchaser's covenants in this Agreement, and (iii) the Assumed Liabilities. Purchaser's obligation to indemnify such Seller Indemnified Parties pursuant to this Section 4.2(c) will not relieve Purchaser of, or alter in any way, Purchaser's obligation to fully satisfy all of Purchaser's liabilities with respect to the Assumed Liabilities.

(d)     Purchaser will not be required to indemnify any Seller Indemnified Party with respect to any breach by Purchaser of any of the Purchaser representations and warranties in this Agreement and the Ancillary Agreements, except to the extent that the cumulative amount of

the Damages actually incurred by such Seller Indemnified Parties as a result of all such breaches of the representations and warranties exceeds one million dollars ($1,000,000).

(e)    The total amount of the indemnity payments that Purchaser may be required to make under or in connection with this Agreement with respect to breaches by Purchaser of the representations and warranties in this Agreement and the Ancillary Agreements will be limited in the aggregate to five million five hundred thousand dollars ($5,500,000).

**4.3.    Adjustments to Indemnification Payments.** Any payment made by Seller to Purchaser Indemnified Parties, on the one hand, or by Purchaser to Seller Indemnified Parties on the other hand, pursuant to this Section 4 in respect of any claim made hereunder shall be net of any insurance proceeds realized by and paid to the Party indemnified hereunder in respect of such claim, adjusted for any increase in premiums associated therewith. Seller and Purchaser shall use commercially reasonable efforts to make insurance claims relating to any claim for which indemnification is sought pursuant to this Section 4. In addition, each Party indemnified hereunder shall take all reasonable steps to mitigate all losses, costs, expenses and damages after becoming aware of any event which could reasonably be expected to give rise to any losses, costs, expenses and damages that are indemnifiable or recoverable hereunder or in connection herewith.

**4.4.    Notice; Procedure.**

(a)    A Purchaser Indemnified Party or Seller Indemnified Party (an *"Indemnified Party"*) shall give written notice of a claim (a *"Claim Notice"*) for indemnification under Section 4.1 or 4.2, as applicable, to the applicable indemnifying party (the *"Indemnifying Party"*) promptly after becoming aware of the existence of such claim or receipt of any written claim by any third party, as applicable, and in any event not later than twenty (20) business days after receipt of any such written claim (or not later than ten (10) business days after the receipt of any such written claim in the event such written claim is in the form of a formal complaint filed with a court of competent jurisdiction and served on the Indemnified Party), specifying in reasonable detail the amount, nature and source of the claim, and including therewith copies of any notices or other documents received from third parties with respect to such claim; provided, however, that failure to give such notice shall not limit the right of an Indemnified Party to recover indemnity or reimbursement except to the extent that the Indemnifying Party suffers any material prejudice or material harm with respect to such claim as a result of such failure. The Indemnified Party shall also provide the Indemnifying Party with such further information concerning any such claims as the Indemnifying Party may reasonably request by written notice.

(b)    Within fifteen (15) business days after receiving the Claim Notice, the Indemnifying Party shall, by written notice to the Indemnified Party, either (i) concede or deny liability for the claim in whole or in part, or (ii) in the case of a claim asserted by a third party, advise that the matters set forth in the Claim Notice are, or will be, subject to contest or legal proceedings not yet finally resolved. If the Indemnifying Party concedes liability in whole or in part, it shall, promptly following such concession, but in any event within five (5) business days, pay the amount of the claim to the Indemnified Party to the extent of the liability conceded. Any such payment shall be made in immediately available funds equal to the amount of such claim so payable and otherwise in accordance with this Agreement and the Escrow Agreement. If the

Indemnifying Party denies liability in whole or in part or advises that the matters set forth in the notice are, or will be, subject to contest or legal proceedings not yet finally resolved, then the Indemnifying Party shall make no payment (except for the amount of any conceded liability payable as set forth above) until the matter is resolved in accordance with this Agreement.

(c)     With respect to non-third party claims, if within such fifteen (15) business day period the Indemnifying Party does not give written notice to the Indemnified Party that it denies such liability, the Indemnifying Party shall promptly pay to the Indemnified Party the amount of such claim. If the Indemnifying Party provides written notice to the Indemnified Party with such fifteen (15) business day period that it denies liability for any portion of such claim, the parties shall in good faith attempt to reach an agreement with regard to such contested amount and/or claim within thirty (30) days of receipt by the Indemnified Party of such notice. If the parties cannot resolve the matter within such period, then the parties may seek remedy and recourse in accordance with Section 6.5.

(d)     In the case of any third party claim, if within fifteen (15) business days after receiving the Claim Notice, the Indemnifying Party (i) gives written notice to the Indemnified Party stating that the Indemnifying Party would be liable under the provisions hereof for indemnity in the amount of such claim if such claim were valid and that the Indemnifying Party disputes and intends to defend against such claim, liability or expense at the Indemnifying Party's own cost and expense and (ii) provides assurance reasonably acceptable to such Indemnified Party that such indemnification will be paid fully and promptly if required and such Indemnified Party will not incur cost or expense during the proceeding, then counsel for the defense shall be selected by the Indemnifying Party (subject to the consent of such Indemnified Party which consent shall not be unreasonably withheld) and such Indemnifying Party shall not be required to make any payment to the Indemnified Party with respect to such claim, liability or expense as long as the Indemnifying Party is conducting a good faith and diligent defense at its own expense; provided, however, that the assumption of defense of any such matters by the Indemnifying Party shall relate solely to the claim, liability or expense that is subject or potentially subject to indemnification; and provided, further, that the Indemnifying Party shall not be permitted to assume the defense of any (i) criminal matter, (ii) matter in which an injunction is sought against the Indemnified Party, or (iii) matter in which, in the written opinion of counsel to the Indemnified Party, the Indemnified Party has separate defenses from the Indemnifying Party or there is an actual conflict of interest between the Indemnifying Party and the Indemnified Party. If the Indemnifying Party assumes such defense in accordance with the preceding sentence, it shall have the right, with the consent of such Indemnified Party, which consent shall not be unreasonably withheld, to settle all indemnifiable matters related to claims by third parties which are susceptible to being settled provided the Indemnifying Party's obligation to indemnify such Indemnified Party therefor will be fully satisfied only by payment of money by the Indemnifying Party pursuant to a settlement which includes a complete release of such Indemnified Party. The Indemnifying Party shall keep such Indemnified Party apprised of the status of the claim, liability or expense and any resulting suit, proceeding or enforcement action, shall furnish such Indemnified Party with all documents and information that such Indemnified Party shall reasonably request and shall consult with such Indemnified Party prior to acting on major matters, including settlement discussions. Notwithstanding anything herein stated, such Indemnified Party shall at all times have the right to fully participate in such defense at its own expense directly or through counsel; provided, however, if the named parties to the

31

action or proceeding include both the Indemnifying Party and the Indemnified Party and representation of both parties by the same counsel would be inappropriate under applicable standards of professional conduct, the reasonable expense of separate counsel for such Indemnified Party shall be paid by the Indemnifying Party provided that such Indemnifying Party shall be obligated to pay for only one counsel for the Indemnified Party in any jurisdiction. If no such notice of intent to dispute and defend is given by the Indemnifying Party, or if such diligent good faith defense is not being or ceases to be conducted, such Indemnified Party may undertake the defense of (with counsel selected by such Indemnified Party), and shall have the right to compromise or settle, such claim, liability or expense (exercising reasonable business judgment) with the consent of the Indemnifying Party, which consent shall not be unreasonably withheld. If such claim, liability or expense is one that by its nature cannot be defended solely by the Indemnifying Party, then such Indemnified Party shall make available all information and assistance that the Indemnifying Party may reasonably request and shall cooperate with the Indemnifying Party in such defense.

**4.5.** **Exclusive Remedy.** The right of the Purchaser Indemnified Parties and Seller Indemnified Parties to assert indemnification claims and receive indemnification payments pursuant to this Section 4 will be the sole and exclusive right and remedy exercisable by the Purchaser Indemnified Parties and Seller Indemnified Parties with respect to any breach by the Parties under this Agreement or in any of the Ancillary Agreements and the transactions contemplated hereby and thereby. The Escrow Fund shall be the exclusive source of monetary relief in respect of any breach by Seller of its representations and warranties under this Agreement or any of the Ancillary Agreements, other than with respect to fraud, intentional misrepresentation or a breach of any Specified Representation.

**4.6.** **No Materiality.** For purposes of any calculation of Damages made hereunder, once a breach of any representation, warranty or covenant shall have been established, all qualifications in such representation, warranty or covenant relating to "materiality," "material adverse effect," "in all material respects" and words and phrases of similar meaning shall be disregarded.

**4.7.** **Risk Allocation.** The representations, warranties, covenants and agreements made herein, as modified by the Schedules, together with the indemnification provisions herein, are intended among other things to allocate the economic cost and the risks inherent in the transactions contemplated hereby between the Parties and, accordingly, a Party shall be entitled to the indemnification or other remedies provided in this Agreement by reason of any breach of any such representation, warranty, covenant or agreement, as modified by the Schedules, by another Party notwithstanding whether any Party, employee, representative or agent of such Party seeking to enforce a remedy knew or had reason to know of such breach and regardless of any investigation by such Party.

**4.8.** **Treatment of Indemnity Payments.** The parties acknowledge and agree that any payments made in accordance with this Section 4 shall be deemed to be an adjustment to the consideration paid by Purchaser to Seller for the Assets hereunder.

## 5.    POST-CLOSING COVENANTS

### 5.1.    Non-competition, Non-solicitation and Non-disparagement.

(a)    For a period of ten (10) years after the Closing Date, neither Seller nor any Stockholder nor any of their respective Affiliates shall, anywhere in the world, directly or indirectly, whether as owner, partner, member, equity holder, director, officer, trustee, agent, employee, co-venturer or otherwise, invest in, own, manage, operate, finance, control, advise, render services to or guarantee the obligations of any Person engaged in or planning to become engaged (either directly or through such Person's Affiliates) in the Business; provided that Dr. Joseph A. Megy may from time to time provide expert witness consultation and services.

(b)    For a period of ten (10) years after the Closing Date, neither Seller nor any Stockholder shall, directly or indirectly:

(i)    solicit the business of any Person who is a customer or prospective customer of Purchaser or any of its Affiliates with respect to the Business or any other businesses providing similar value-added products and services to the aluminum industry;

(ii)    cause, induce or attempt to cause or induce any customer, prospective customer, vendor, prospective vendor, supplier, prospective supplier, licensee, licensor, franchisee, employee, consultant or other business relation of Purchaser or any of its Affiliates to cease doing business with Purchaser or any of its Affiliates, to deal with any competitor of Purchaser or any of its Affiliates or in any way interfere with its relationship with Purchaser or any of its Affiliates;

(iii)    cause, induce or attempt to cause or induce any customer, prospective customer, vendor, prospective vendor, supplier, prospective supplier, licensee, licensor, franchisee, employee, consultant or other business relation of any Seller on the Closing Date or within the year preceding the Closing Date to cease doing business with Purchaser or any of its Affiliates, to deal with any competitor of Purchaser or any of its Affiliates or in any way interfere with its relationship with Purchaser or any of its Affiliates; or

(iv)    hire, retain or attempt to hire or retain any employee or independent contractor of Purchaser or any of its Affiliates or any employee of any Seller on the Closing Date or within the year preceding the Closing Date or in any way interfere with the relationship between Purchaser or any of its Affiliates and any of its employees or independent contractors; provided, however, that there shall be no limitation on the right to hire or retain (or attempts relating thereto) with respect to any employee or independent contractor if (A) such employee or independent contractor has been terminated by Purchaser and (B) Purchaser consents to such retention or hiring, which consent may not be unreasonably withheld.

33

(c)      After the Closing Date, no Party hereto will directly or indirectly disparage another Party or any other Party's Affiliates, stockholders, members, partners, directors, officers, employees or agents.

(d)      If a final judgment of a court or tribunal of competent jurisdiction determines that any term or provision contained in this Section 5.1 is invalid or unenforceable, then the Parties agree that the court or tribunal will have the power to reduce the scope, duration or geographic area of the term or provision, to delete specific words or phrases or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision. This Section 5.1 will be enforceable as so modified after the expiration of the time within which the judgment may be appealed. This Section 5.1 is reasonable and necessary to protect and preserve Purchaser's legitimate business interests and the value of the Assets and to prevent any unfair advantage conferred on Seller or the Stockholders.

(e)      After the final adjudication (whether through arbitration, a court proceeding or agreement of the applicable parties) of any Damages arising out of any breach of the covenants set forth in this Section 5.1, at the option of Purchaser, Purchaser may make a claim against any amounts remaining in the Escrow Fund, provided such claim is made prior to eighteen (18) months from the Closing Date and there are any amounts remaining in the Escrow Fund.

5.2.      **Confidentiality.** From and after the Closing Date, Seller shall, and shall cause its Affiliates, agents and representatives to, hold in strict confidence and not use or disclose any confidential or proprietary information or data of Purchaser, whether such information is acquired as part of the transactions contemplated by this Agreement or otherwise.

5.3.      **Amendment of Name.** As promptly as possible and in any case within ten (10) days after the Closing Date, Seller shall change its name to remove any reference to "Jamegy" to a name that is reasonably acceptable to Purchaser, and shall cease to use such name for any purposes (other than as reasonably necessary in the course of winding up its operations).

5.4.      **No Dissolution; Capitalization.** For the period (the "*Post-Closing Survival Period*") commencing on the Closing Date and extending until the later to occur of (a) eighteen (18) months following the Closing, (b) Final Resolution of the Specific Claims, (c) Final Resolution of any OSHA claims and/or proceedings in respect of the December 2006 Fire (which Final Resolution may be satisfied, for purposes of this clause (c), by the expiration of the applicable statute of limitations with respect to any OSHA citations regarding the December 2006 Fire, or if no citations are issued by such time, June 29, 2008), and (d) such time as no amounts remain in the Escrow Fund or Claims remain outstanding, Seller shall, and each Stockholder shall cause Seller to, maintain and keep its corporate existence in good standing in accordance with the laws of the State of Oregon, and shall not dissolve, liquidate or otherwise wind up its affairs. During such Post-Closing Survival Period, Seller shall, and each Stockholder shall cause Seller to, (i) keep in effect and maintain the "tail" insurance policy with respect to its existing Employer's Practices Liability insurance, and (ii) fund one or more accounts at one or more qualified financial institutions reasonably acceptable to Purchaser with five million dollars ($5,000,000) in available cash. Seller and the Stockholders shall be permitted to use such funds

in their reasonable discretion to make payments in connection with the discharge of the Retained Liabilities (other than the Retained Liabilities set forth on Schedule 5.4), including in connection with the resolution of any indemnification claims in respect thereto, and/or any claims for Damages in respect of from the December 2006 Fire (as described in Section 4.1(c)) *(in each case, "Permitted Use of Funds")*; provided, however, that until such time as the Final Resolution of the December 2006 Fire, at no time shall the aggregate amount of funds in such account(s) be less than the sum of $2,500,000 and the amount then subject to claims for indemnification under Section 4.1(c) (other than claims for breach of representation and warranty (but excluding the Specified Representations)). Seller shall not, and the Stockholders shall cause Seller not to, other than the Permitted Use of Funds, transfer, withdraw or otherwise remove funds (including interest) from the account(s) until the end of the Post-Closing Survival Period. Upon the request of Purchaser, Seller shall, and each Stockholder shall cause Seller to, provide Purchaser with evidence reasonably satisfactory to Purchaser of Seller's compliance with this Section 5.4.

5.5.    **Collection of Assets.** Subsequent to the Closing, Purchaser shall have the right and authority to collect all receivables (other than those listed in Schedule 1.2(b)) and other items transferred and assigned to it by Seller hereunder and to endorse with the name of Seller any checks received on account of such receivables or other items, and Seller agrees that it will promptly transfer or deliver to Purchasers from time to time, any cash or other property that Sellers may receive with respect to any claims, contracts, licenses, leases, commitments, sales orders, purchase orders, receivables of any character or any other items included in the Assets.

5.6.    **Discharge of Retained Liabilities; Assumed Liabilities.**

(a)    Seller shall pay and discharge all of the Retained Liabilities in the ordinary course of business as they become due. Without limiting the foregoing, Seller shall pay any and all taxes related to the Business and Assets for the period ending on the Closing Date, where the failure to pay such taxes would create or impose liability on Purchaser, impose any Claim on the Assets, or adversely affect Purchaser.

(b)    Purchaser shall pay and discharge all of the Assumed Liabilities in the ordinary course of business as they become due. Without limiting the foregoing, Purchaser shall pay any and all taxes related to the Business and Assets for the period beginning after the Closing Date, where the failure to pay such taxes would create or impose liability on Seller, impose any Claim on the Excluded Assets, or adversely affect Seller.

5.7.    **Environmental Obligations.** Seller covenants and agrees, at Seller's sole cost and expense, to contract with a licensed, nationally recognized environmental consultant(s) or engineer(s) (*"Environmental Service Provider(s)"*) selected by Seller in its reasonable discretion and approved by Purchaser, which approval shall not be unreasonably withheld prior to Closing, and cause such Environmental Service Provider(s) to: (a) undertake all quarterly groundwater monitoring and annual surface water monitoring required to be undertaken at or in connection with the Seller Facilities in accordance with the Final Reports with respect to the Voluntary Remediation and Redevelopment Program Projects 03661 and 03236, respectively; (b) decommission and close or abandon all monitoring wells installed at or in connection with the Seller Facilities by or on behalf of Seller in accordance with applicable Environmental Laws and

35

any instructions of the West Virginia Department of Environmental Protection ("*WVDEP*") following the completion of any required monitoring; (c) dispose off-site of any wastes generated as part of such monitoring activities, if any, including any purged groundwater or groundwater sampling residues, provided that groundwater sampling residues, purged water and other materials and wastes generated in the course of undertaking the required monitoring shall be characterized and disposed off-site as soon as is reasonably practicable, and in any event, within time periods authorized by, and in accordance with, applicable Environmental Laws, such as to avoid the necessity of having to secure any hazardous waste or solid waste permits or authorizations; and (d) undertake any additional investigation, remediation or monitoring activities required by the WVDEP relating to any environmental conditions existing at, from or relating to the Seller Facilities, the Assets or the Business prior to the Closing. Each of Seller and Purchaser shall cooperate, and Seller shall cause each such Environmental Service Provider to consult with Purchaser, so as to enable the applicable Environmental Service Provider to take all of the actions identified in this Section 5.7 on behalf of Seller in a manner so as not to unreasonably interfere with Purchaser's use of the Seller Facilities and/or operation of the Business. Seller shall provide Purchaser with a copy of all reports, data and material documents prepared or generated in connection with the actions identified in this Section 5.7. Nothing in this Section 5.7 is intended or shall be construed to broaden or lessen Seller's responsibility for Retained Liabilities.

5.8.    **OSHA-Related Matters.** Each Party shall cooperate with the other Parties in connection with the OSHA Settlement and the December 2006 Fire. Seller has heretofore engaged a consultant (together with any other consultant with appropriate expertise mutually selected and engaged by Purchaser and Seller, "*Consultant*") to review the procedures and equipment utilized by the Business that are subject of the OSHA Settlement. Without limiting any other provision of this Agreement, Seller shall pay for 100% of the costs and expenses associated with the engagement of each Consultant.

(b)    Seller shall, in light of its compliance obligations under the OSHA Settlement, pursue options to modify the cleaning procedures and install a new lifting system at the tank to allow for blade changes outside of the tank, and present design alternatives to Purchaser in respect thereof. Seller shall, with the consent of Purchaser, which consent shall not be unreasonably withheld, implement such changes, and Seller shall be responsible for 100% of the costs and expenses of implementing such new procedures and the acquisition of any new equipment.

(c)    Seller and Purchaser may engage a Consultant to perform an analysis of the causes of the December 2006 Fire and provide recommendations to Purchaser for the improved safety of the operations of the Business and the Seller Facilities in light of such causes. Such analyses shall be performed independently of any required review or investigation by or on behalf of OSHA.

(d)    Each of the parties shall use its commercially reasonable efforts to cause the foregoing review and analysis, and any necessary remedial actions, to be conducted and/or implemented, as applicable, in a manner so as not to unreasonably interfere with Purchaser's use of the Seller Facilities and/or operation of the Business.

(e)     Nothing in this Section 5.8 is intended or shall be construed to broaden or lessen Seller's responsibility for Retained Liabilities or in any way limit Seller's or the Stockholders' indemnification obligations under Section 4.1.

## 6.    MISCELLANEOUS.

**6.1.    No Other Representations.** The Parties acknowledge that, except as expressly set forth in Sections 2 and 3 and in the Ancillary Agreements, no Party has made or is making any representations or warranties whatsoever to the other, implied or otherwise.

**6.2.    Knowledge.** References to the knowledge or awareness of Seller shall be deemed to mean the actual knowledge of the Seller, stockholders, directors, officers of each of Jamegy and Jamegy WV, as of immediately prior to the Closing and each of David Whitehead, Frank Roberts and Mark Vignovic, in each case after reasonable inquiry.

**6.3.    Access of Seller to Books and Records.** At all times after the Closing Date, Purchaser will give Seller and Seller's advisors and representatives reasonable access to all books and records of Seller that are included in the Assets (to the extent such books and records relate to any period prior to the Closing Date).

**6.4.    Governing Law.**

This Agreement will be construed in accordance with, and governed in all respects by, the laws of the State of New York (without giving effect to principles of conflicts of law).

**6.5.    Venue and Jurisdiction; No Jury Trial.**

(a)     The Parties (i) hereby irrevocably and unconditionally submit to the jurisdiction of the state courts of New York and to the jurisdiction of the United States District Court for the Southern District of New York for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (ii) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in said courts, and (iii) hereby waive, and agree not to assert, by way of motion, as a defense, counterclaim or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

(b)     EACH PARTY HEREBY WAIVES, TO THE    FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT HE OR IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B)

ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

    **6.6.**    **Notices.** Any notice or other communication required or permitted to be delivered to either Party under this Agreement must be in writing and will be deemed properly delivered, given and received when delivered (by hand, by registered mail, by courier or express delivery service or by facsimile) to the address or facsimile telephone number set forth beneath the name of such Party below (or to such other address or facsimile telephone number as such Party shall have specified in a written notice given to the other Party):

        if to Purchaser:

        Al Solutions, Inc.
        c/o BlackRock Kelso Capital
        40 East 52nd Street
        New York, NY 10022
        Attn: Marshall Merriman and Stephen Sachman
        Phone: 212-810-5800
        Fax: 212-810-5801

        and

        Tremont Associates
        25 Burlington Mall Road, Suite 105
        Burlington, MA 01803
        Attn: Henry B. Goddard III and Troy Kenyon
        Phone: 781-272-7910 x1102
        Fax: 781-710-3094

        with a copy to:

        Proskauer Rose LLP
        One International Place
        Boston, MA 02110
        Attn: Michael K. Harrington, Esq.
        Phone: 617-526-9711
        Fax: 617-526-9899

        and

        Goodwin Procter LLP
        599 Lexington Avenue
        New York, NY 10022
        Attn: Andrew J. Weidhaas, Esq.
        Phone: 212-813-8814
        Fax:

if to Seller:

Jamegy, Inc.
c/o Joseph A. Megy
137 Casa Sueno Court
Richland, WA 99352
Phone: 509-628-9223

and

Jamegy, Inc.
c/o Devin Megy
136 Lincoln Highlands Drive
Coraopolis, PA 15108
Phone: 208-964-6405

with a copy to:

Cooley Godward Kronish LLP
11951 Freedom Drive
Reston, VA 20190-5656
Attn: Adam Salassi, Esq.
Phone: 703-456-8131
Fax: 703-456-8100

**6.7.    Public Announcements.**    Except as may be required by any Legal Requirement, neither Party will (and neither Party will permit any of its advisors or representatives to) issue any press release or make any public statement regarding this Agreement or any of the transactions contemplated by this Agreement, without the other Party's prior written consent (which will not be unreasonably withheld).

**6.8.    Assignment.**    Neither Party may assign any of its rights or delegate any of its obligations under this Agreement (whether voluntarily, involuntarily, by way of merger or otherwise) to any other Person without the prior written consent of the other Party provided however, that (without limiting Purchaser's obligations under or relating to this Agreement) Purchaser may, before the Closing, assign its right to receive all or any of the Assets to an affiliate of Purchaser; provided, further, that Purchaser may assign this Agreement and its rights hereunder (i) to a successor to its business, whether by merger, asset sale or otherwise and (ii) to its lenders in connection with any financing arrangement.    Subject to the foregoing, this Agreement shall be binding upon the successors and assigns of the Parties.

**6.9.    Parties in Interest.**    Nothing in this Agreement is intended to provide any rights or remedies to any employee of Seller or to any other Person other than the Parties, other than as provided in Section 4 hereof.

39

**6.10.    Severability.**  In the event that any provision of this Agreement, or the application of such provision to any Person or set of circumstances, shall be determined to be invalid, unlawful, void or unenforceable to any extent, the remainder of this Agreement, and the application of such provision to Persons or circumstances other than those as to which it is determined to be invalid, unlawful, void or unenforceable, will not be affected and will continue to be valid and enforceable to the fullest extent permitted by law.

**6.11.    Entire Agreement.**  This Agreement, the Confidentiality Agreements (which remain in full force and effect), and the Ancillary Agreements set forth the entire understanding of the Parties and supersede all other agreements and understandings between the Parties relating to the subject matter hereof and thereof.

**6.12.    Waiver.**  No failure on the part of either Party to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of either Party in exercising any power, right, privilege or remedy under this Agreement, will operate as a waiver thereof; and no single or partial exercise of any such power, right, privilege or remedy will preclude any other or further exercise thereof or of any other power, right, privilege or remedy.

**6.13.    Amendments.**  This Agreement may not be amended, modified, altered or supplemented except by means of a written instrument executed on behalf of all of the Parties.

**6.14.    Counterparts.**  This Agreement may be executed in several counterparts, each of which will constitute an original and all of which, when taken together, will constitute one agreement.

**6.15.    Interpretation of Agreement.**  Each Party acknowledges that it has participated in the drafting of this Agreement, and any applicable rule of construction to the effect that ambiguities are to be resolved against the drafting party will not be applied in connection with the construction or interpretation of this Agreement.

      **(a)**    Whenever required by the context hereof, the singular number will include the plural, and vice versa; the masculine gender will include the feminine and neuter genders; and the neuter gender will include the masculine and feminine genders.

      **(b)**    As used in this Agreement, the words "include" and "including," and variations thereof, will not be deemed to be terms of limitation, and will be deemed to be followed by the words "without limitation."

      **(c)**    Unless the context otherwise requires, references in this Agreement to "Sections," "Schedules" and "Exhibits" are intended to refer to Sections of and Schedules and Exhibits to this Agreement.

      **(d)**    The table of contents of this Agreement and the bold-faced headings contained in this Agreement are for convenience of reference only, will not be deemed to be a part of this Agreement and will not be referred to in connection with the construction or interpretation of this Agreement.

**6.16.**          **Remedies.**  It is specifically understood and agreed that any breach of the provisions of this Agreement or any Ancillary Agreement may result in irreparable injury to the other Parties and their Affiliates, that the remedy at law alone will be an inadequate remedy for such breach, and that, in addition to any other remedies which they may have, such other Parties may enforce their respective rights by actions for specific performance.

[End of Text]

PURCHASER:

AL SOLUTIONS, INC.

By: _Henry B Goddard III_

Name: Henry B Goddard III
Title:  President

12-28-'06 20:09 FROM-

T-835  P005/013 F-742

IN WITNESS WHEREOF the Parties hereto have caused this Agreement to be executed as of the date set forth above by their duly authorized representatives.

**SELLERS:**

**JAMEGY, INC.**

By: _____

Name: Devin Megy

Title:  Chief Executive Officer

**JAMEGY WV, INC.**
A wholly-owned subsidiary of Jamegy, Inc.;

By: _____

Name: Devin Megy

Title:  Chief Executive Officer

[Signature page to Asset Purchase Agreement]

**STOCKHOLDERS:**

JOSEPH A. MEGY

Joseph A. Megy

**DEVIN MEGY REMAINDER TRUST**

By: _____
Name: Devin Megy
Title: Co-Trustee

By: _____
Name: Joseph A. Megy
Title: Co-Trustee

**JEFF MEGY REMAINDER TRUST**

By: _____
Name: Devin Megy
Title: Co-Trustee

By: _____
Name: Joseph A. Megy
Title: Co-Trustee

**SEAN MEGY REMAINDER TRUST**

By: _____
Name: Devin Megy
Title: Co-Trustee

By: _____
Name: Joseph A. Megy
Title: Co-Trustee

Schedule 2.6(a)(ii) Permits
Schedule 2.6(b) Environmental Laws
Schedule 2.6(c) Actions Resulting in Environmental Liability
Schedule 2.6(f) Environmental Obligations
Schedule 2.7 Changes in Seller's Business
Schedule 2.8(b) Regulatory Matters
Schedule 2.9(a) Employee Programs Maintained by Seller
Schedule 2.9(i) Certain Employee Claims
Schedule 2.10 Certain Liabilities of Seller
Schedule 2.11 Litigation
Schedule 2.12 Accounts Payable of Seller; Suppliers
Schedule 2.13 Certain Accounts Receivable of Seller
Schedule 2.14 Significant Customers; Distributors
Schedule 2.15 Inventory
Schedule 2.17 Required Consents
Schedule 2.18(a) Financial Statements
Schedule 2.18(c) Financial Projections
Schedule 2.19(b) Tax Returns of Seller
Schedule 2.19(d) Tax Audits & Extensions
Schedule 2.19(e) Tax Sharing Agreements
Schedule 2.20 Affiliate Transactions
Schedule 2.21 Insurance
Schedule 2.23 Warranties
Schedule 3.5 Purchaser Consents
Schedule 5.4 Discharge of Certain Retained Liabilities

## EXHIBIT A

## CERTAIN DEFINITIONS

For purposes of the Agreement:

"**Affiliate**" means, with respect to any Person, any Person that directly or indirectly controls, is directly or indirectly controlled by or is directly or indirectly under common control with such specified Person.

"**Agreement**" means the Asset Purchase Agreement to which this Exhibit A is attached, including the Seller Disclosure Schedules and the Purchaser Disclosure Schedules, and all other exhibits and schedules thereto.

"**Consent**" means any consent, approval or waiver.

"**Contracts**" means (i) the contracts and other instruments identified on Schedule 2.5(a) and (ii) each other contract or other instrument relating exclusively to any one or more of the Products that is executed or entered into on behalf of Seller on or after the date of this Agreement and prior to the Closing in the ordinary course of business or with the approval of Purchaser.

"**Copyrights**" means all rights in and to any tangibly fixed original works of authorship created by or on behalf of Seller, including, but not limited to, unregistered copyrights in both published and unpublished works, including without limitation all compilations, databases and computer programs, manuals and other documentation, all copyright registrations and applications, all derivatives, translations, adaptations and combinations of the above, and all goodwill and moral rights therein.

"**Damages**" means any and all damages, liabilities, losses, claims, obligations, liens, assessments, judgments, fines, penalties, reasonable costs and expenses (including, without limitation, reasonable fees of counsel), as the same are incurred, of any kind or nature whatsoever (whether or not arising out of third party claims and including all amounts paid in investigation, defense or settlement of the foregoing, but excluding any special, punitive or consequential damages (other than those incurred by third parties and included in such third party claim)).

"**December 2006 Fire**" means the fire at the Seller Facilities in West Virginia on or about December 21, 2006 in the production building of the Seller Facilities.

"**EBITDA**" shall mean earnings before interest, tax, depreciation and amortization, as derived using financial statements prepared in accordance with GAAP.

"**Employees**" means the employees of Seller who are based at the Seller Facilities or are listed on Schedule A.

"**Environmental Laws**" means all federal, state or local laws (including any statute, rule, regulation, ordinance, code or rule of common law), and all judicial or administrative interpretations thereof, and all decrees, judgments, policies, written guidance or judicial or

A-1

administrative orders relating to the environment, health, safety or Hazardous Substances, including the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9901 et seq., the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq., the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11001 et seq., the Clean Air Act, 42 U.S.C. § 7401 et seq., the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq., the Toxic Substance Control Act, 15 U.S.C. § 2601 et seq., the Safe Drinking Water Act, U.S.C. § 300f et seq., the Occupational Safety and Health Act, 42 U.S.C. § 1801 et seq., the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136 et seq., the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 et seq., and their state counterparts or equivalents, all as amended, and any regulations or rules adopted or promulgated pursuant thereto.

"**Goodwill**" includes any close personal close personal and ongoing business relationships, trade secrets and knowledge in connection with the Seller's business of the manufacture and sale of the Products and any and all other services performed by the Seller, through the personal ability, personality, reputation, skill and integrity of each Seller, and other information relating thereto.

"**Governmental Authorizations**" means those state and local business licenses and permits necessary to operate the Business, including without limitation the Permits.

"**Hazardous Substance**" means any: contaminant or pollutant; toxic, radioactive or hazardous waste, chemical, substance, material or constituent; asbestos; polychlorinated byphenyls (PCBs); paint containing lead or mercury; fixtures containing mercury or urea formaldehyde; natural or liquefied gas; flammable, explosive, corrosive, radioactive, medical and infectious waste; and oil or other petroleum product, all as defined in Environmental Laws.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and the rules promulgated thereunder.

"**Know-How**" means all know-how, technology and technical information, procedures, processes, trade secrets, formulae, applicable production methods, practices, techniques, parts, diagrams, drawings, specifications, blue prints, lists of materials, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals, production manuals and data relating to the design, manufacture, production, inspection, testing, storage, use of the Products known by, available to or used or owned by Seller or are otherwise set forth on Schedule B.

"**Legal Requirement**" means any law, rule or regulation of any governmental body.

"**Litigation Reserve Amount**" means four million five hundred thousand dollars ($4,500,000).

"**Marks**" means any and all trade names, corporate or business names, trade dress, logos, packaging design, slogans, Internet domain names, registered and unregistered trademarks and service marks and related registrations and applications for registration.

A-2

**"Matter"** means any claim, demand, dispute, action, suit, proceeding, investigation or other similar matter.

**"OSHA"** means the Occupational Safety and Health Administration, as part of the United States Department of Labor, or any successor agency thereto.

**"OSHA Settlement"** means the settlement order between OSHA and Seller dated December 19, 2006 and attached hereto as Exhibit P.

**"Parties"** has the meaning set forth in the introductory paragraph of the Agreement.

**"Patents"** means, collectively, the core business patents (*"Core Business Patents"*) and the grain refinement patents (*"Grain Refinement Patents"*) and the provisional patent application (the *"Patent Application"*). The Core Business Patents include: (i) US Patent 5,171,359 Refractory Metal SWARF Composition, (ii) US Patent 5,597,401 Refractory Metal SWARF Composition and Method of Making Same, and (iii) US Patent 5,776,225 Refractory Metal Sponge Fines Composition. The Grain Refinement Patents include: (i) US Patent 5,935,295 Molten Aluminum Treatment, and (ii) US Patent 6,217,632 B1 Molten Aluminum Treatment, and all divisions, continuations, continuations-in-part, reissues, extensions, reexaminations and renewals of such patents in the U.S. and all foreign countries. The Patent Application consists of a provisional patent application entitled Method of Recovering Titanium from Wheel Grinding of Refractory Metal Forged Shapes, filed with the United States Patent and Trademark Office (Filed September 18, 2006; Application US60/845,591; Attorney Docket No. JD3-001).

**"Person"** means any individual, corporation, general partnership, limited partnership, limited liability company, trust, association, firm, organization, company, business, entity, union, society or governmental body.

**"Products"** means Seller's titanium alloying products Ty-Gem B, Ty-Gem BM, Ty-Gem AG, Ty-Gem AGM, Ty-Gem FG, and Ty-Gem FGM; and Seller's zirconium alloying products Zy-Gem CP, Zy-Gem CPM, and Zy-Gem AGM.

**"Purchaser Disclosure Schedules"** means the disclosure schedules delivered by Purchaser to Seller contemporaneously with the execution and delivery of the Agreement.

**"Regulatory Filings"** means the regulatory applications and governmental registrations identified on Schedule C.

**"Remainder Trusts"** means the remainder trusts established for the benefit of the children of Dr. Joseph A. Megy pursuant to the terms of the Joseph A. Megy Grantor Retained Annuity Trust No. 1.

**"Seller Disclosure Schedules"** means the disclosure schedules delivered by Seller to Purchaser contemporaneously with the execution and delivery of the Agreement.

**"Seller Intellectual Property"** means any and all of the following: intellectual property rights owned by or licensed to Seller and its Affiliates or used by Seller in the Business: any and

all Patents, Marks or Copyrights (or application for any of the foregoing), Know-How, any confidential business information, any material that could be patented, trademarked, or copyrighted, in the United States and all foreign countries and all other proprietary rights.

B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------x

AL SOLUTIONS, INC.,                                 :        Index No. 601547/2008
                                                    :
                        Plaintiff,                  :        Commercial Division
                                                    :
                                                    :
    - against -                                     :        **STIPULATION**
                                                    :
                                                    :
                                                    :
JAMEGY, INC. a/k/a/ TITAN HOLDINGS, INC. and        :
JAMEGY WV, INC. a/k/a TITAN HOLDINGS WV,            :
INC.,                                               :
                                                    :
                        Defendants.                 :
                                                    :
-----------------------------------------------------------x

**IT IS HEREBY STIPULATED AND AGREED BY AND BETWEEN**

Plaintiff, AL Solutions, Inc., and Defendants Jamegy, Inc. a/k/a/ Titan Holdings, Inc.

and Jamegy WV, Inc. a/k/a Titan Holdings WV, Inc., (together, "Jamegy" or the

"Defendants"), by and through their undersigned counsel, as follows:

    1.      Service of the Complaint on Defendants, by electronic delivery to their

respective counsel, shall be deemed effective as of May 27, 2008.

2.    The Defendants, being fully aware of their rights, waive, relinquish and forego any defense of improper or defective service with respect to the Complaint.

3.    The Defendants shall answer, move or otherwise respond to the Complaint on or before July 28, 2008.

DATED: May 27, 2008

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

Michael W. Mitchell
John Boyle
Four Times Square
New York, New York 10036
(212) 735-3000


Attorneys for Plaintiff

COOLEY GODWARD KRONISH LLP

Robert R. Vieth
Joseph J. Samarias
Adam Salassi
One Freedom Square - Reston Town Center
11951 Freedom Drive
Reston, VA 20190-5656
(703) 456-8000

Attorneys for Defendants

2

## CERTIFICATE OF SERVICE

I, John Boyle, hereby certify that on May 27, 2008, I caused a true and

correct copy of the STIPULATION regarding service of the Complaint to be served on

Defendants Jamegy, Inc. and Jamegy WV, Inc., by serving copies of the same by email

and overnight mail upon the attorneys listed below:

Robert R. Vieth, Esq.
Joseph J. Samarias, Esq.
Adam Salassi, Esq.
COOLEY GODWARD KRONISH LLP
One Freedom Square - Reston Town Center
11951 Freedom Drive
Reston, VA 20190-5656
(703) 456-8000

John Boyle

Index No. 601547/2008
Commercial Division

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

AL SOLUTIONS, INC.,

Plaintiff,

- against -

JAMEGY, INC. a/k/a/ TITAN HOLDINGS, INC., and
JAMEGY WV, INC. a/k/a TITAN HOLDINGS WV, INC.,

Defendants.

STIPULATION

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

ATTORNEYS FOR PLAINTIFF

FOUR TIMES SQUARE
BOROUGH OF MANHATTAN
CITY OF NEW YORK
NEW YORK 10036-6522
(212) 735-3000

*Case No. (07-CV-5567-JGK)(HP)*

*UNITED STATES DISTRICT COURT*
*SOUTHERN DISTRICT OF NEW YORK*

AL SOLUTIONS, INC.

Plaintiff,

-against-

JAMEGY, INC. a/k/a TITAN HOLDINGS, INC. and
JAMEGY WV, INC. a/k/a TITAN HOLDINGS WV, INC.

Defendants.

*NOTICE OF REMOVAL*

Cooley Godward Kronish LLP

*Attorneys for Defendant Aeropostale, Inc.,*

**1114 Avenue of the Americas**
**New York New York 10036**
**(212) 479-6000**