UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X

AL SOLUTIONS, INC.,                              :

        Plaintiff,                          :

    vs.                                          :    Case No. 08 CIV 5515 (CM)

JAMEGY, INC. a/k/a TITAN HOLDINGS,      :
INC. and JAMEGY WV, INC. a/k/a TITAN
HOLDINGS WV, INC.,                             :

       Defendants.

------------------------------------- X

**DECLARATION OF DEVIN MEGY IN SUPPORT
OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO REMAND**

I, Devin Megy, hereby declare:

1.     I am the President and Chief Executive Officer of defendant Titan

Holdings, Inc., formerly known as Jamegy, Inc., and defendant Titan Holdings WV, Inc.,

formerly known as Jamegy WV, Inc. (collectively, the "Titan entities").

2.     I submit this Declaration in support of Defendants' Opposition to

Plaintiff's Motion to Remand [Docket No. 6].

3.     From the fall of 2003 through June 2006, I was the President of Jamegy,

Inc. and Jamegy WV, Inc., and a member of the Jamegy Board of Directors.  In June 2006, I

relinquished my position as President to become Chief Executive Officer of Jamegy, Inc. and

Jamegy WV, Inc., a position that I held from June 2006 through December 2006.

4.     On December 29, 2006, Jamegy, Inc. and Jamegy WV, Inc. and their

related stockholders entered into an Asset Purchase Agreement ("APA") with AL Solutions, Inc.,

the plaintiff in the above-captioned lawsuit.

5.      Pursuant to the APA, AL Solutions, Inc. acquired substantially all of the assets of Jamegy, Inc. and Jamegy WV, Inc. relating to (a) the manufacture, sale, and marketing for sale of titanium and zirconium alloying products for the aluminum industry, (b) process technologies and services for the aluminum industry, (c) aluminum grain refinement technology, products and services, and (d) dry grinding replacement technology.  Included in this acquisition were the former Jamegy manufacturing facilities at 100 South Chester Street, New Cumberland, West Virginia and at 1703 West Main Street, Washington, Missouri.

6.      Consistent with the APA, Jamegy, Inc. changed its name to Titan Holdings, Inc., on or about January 11, 2007.  Jamegy WV, Inc. changed its name to Titan Holdings WV, Inc., on or about January 11, 2007.

7.      The Titan entities are privately held corporations organized under the laws of the State of Oregon, with their principal places of business in Portland, Oregon.  Titan Holdings WV, Inc. is the fully-owned subsidiary of Titan Holdings, Inc.

8.      In February 2007, the Titan entities relocated to Portland, Oregon.  At that time, the Titan entities established offices at 123 NW 12th Avenue, Unit 343, Portland, Oregon. In October 2007, the Titan entities moved to new offices at 1001 NW Lovejoy, Unit 705, Portland, Oregon 97209.  It is at this location that the Titan entities presently conduct their business and maintain their corporate books and records.  To minimize corporate expense and to maximize efficiency, these offices are located inside my home and are properly furnished and sufficient in size for the Titan entities to conduct their business.

9.      The Titan entities maintain a separate corporate mailing address at P.O. Box 1417, Portland, Oregon 97207.

10.    The Titan entities maintain a registered agent at 527 NW Third St., Corvallis, Oregon 97207.

11.    Since the Titan entities relocated to Portland, Oregon in February 2007, the companies have had no operations in West Virginia.

12.    Currently, I am the sole employee and executive officer of the Titan entities.  In addition, Joseph Megy and I are the sole members of the companies' board of directors.  Since the asset sale, the Titan entities have paid me more than $100,000 for my services as an employee and board member.  Since early February 2007, I have performed my duties and have made managerial decisions on behalf of the Titan entities from the companies' offices in Portland, Oregon.  To the extent that decisions on behalf of the Titan entities require consultation with Joseph Megy, Chairman of the companies' board of directors, those decisions are made either in person at the companies' offices in Portland, Oregon, or by telephone between such offices and Joseph Megy's residence in Richland, Washington.

13.    In late 2006, Jamegy, Inc. considered the possibility of liquidation following the execution of the APA.  In light of the post-closing obligations the parties ultimately negotiated, however, Jamegy, Inc. did not pursue liquidation following the asset sale. The Titan entities have not liquidated and are not in the process of winding down.

14.    The Titan entities maintain more than $5.6 million in interest-bearing accounts at PNC Bank in Pittsburgh, Pennsylvania.  Management of these accounts are directed by me from the Titan entities' offices in Portland, Oregon.  Such accounts are maintained in part to satisfy the administrative and legal expenses of the Titan entities, to potentially fund the pursuit of new opportunities for growth consistent with the entities' non-compete obligations, and to uphold the entities' on-going capitalization obligations under the APA.  *See* APA §§ 5.1, 5.4.

15.     Pursuant to the terms of the APA, the Titan entities undertook numerous post-closing obligations.  *See generally* APA § 5 "Post-Closing Covenants".

16.     To begin, the Titan entities agreed on a going-forward basis: (a) "to not dissolve, liquidate or otherwise wind up [their] affairs" (APA § 5.4); (b) to not compete with AL Solutions in certain business areas (APA § 5.1); and (c) to discharge all of the entities' Retained Liabilities, including liabilities related to two separate fires at the former Jamegy facility, certain environmental and OSHA-related liabilities, and liabilities related to benefit and bonus payments to former employees.  *See* APA §§ 5.6 and 1.3(b); and Schedules 1.3(b) and 1.4(c) (attached hereto as Ex. 1).  The Titan entities continue to satisfy these ongoing obligations.  For example, the Titan entities retained liability related to the accidental death of an employee resulting from a July 18, 2006 fire at the former Jamegy facility in West Virginia.  *Id.*  The family of the deceased employee filed suit on November 8, 2006, and the Titan entities are in the process of defending themselves in that litigation.  On behalf of the Titan entities, I spend roughly 20-30 hours a month on that matter, and confer regularly with the companies' attorneys, Steptoe & Johnson PLLC.

17.     In addition, the Titan entities remain obligated to "[k]eep in effect and maintain the 'tail' insurance policy with respect to its existing Employer's Practices Liability insurance" (APA § 5.4).  The Titan entities have done so, and the insurance policy remains in effect.

18.     Also, under the APA the Titan entities were obligated to "fund one or more accounts at one or more qualified financial institutions reasonably acceptable to Purchaser with [$5,000,000] . . . in available cash." (APA § 5.4).  This amount is to be used by the Titan entities to pay the Retained Liabilities, and resolve any indemnification claims.  *Id.*

19.     Moreover, pursuant to the requirements of the APA, the Titan entities at their sole cost have contracted with an Environmental Service Provider.  (APA § 5.7).  At the request of the Titan entities, the Environmental Service Provider has undertaken quarterly groundwater monitoring and annual surface water monitoring at the former Jamegy facility in West Virginia, and has prepared and submitted reports to the Titan entities related to this monitoring.  The Titan entities also have retained the Environmental Service Provider to decommission and abandon all monitoring wells at the former Jamegy facility in West Virginia, to assist the Titan entities in obtaining the requisite governmental authorizations for this work, and to undertake any additional work related to such authorizations.  All of this work has been done (and will continue to be done) pursuant to the APA, which requires the Titan entities, at their sole cost to (a) undertake all quarterly groundwater monitoring and annual surface water monitoring; (b) decommission and close or abandon all monitoring wells; (c) dispose off-site of any wastes generated as part of monitoring activities; and (d) undertake any additionally required investigation, remediation or monitoring activities. (APA § 5.7).  The Environmental Service Provider has performed this work for the Titan entities, and is scheduled to do so through at least January 2009.

20.     The APA also required the Titan entities to cover costs associated with a December 2006 fire at the former Jamegy facility in West Virginia, including but not limited to (a) the cost of building and equipment repairs, (b) the cost of any mutually agreed upon changes to equipment and operating procedures, and (c) the cost of any changes to the business required by governmental authorities.  *See* APA §§ 4.1(c), 5.8.  In the months following the asset sale, the Titan entities reimbursed AL Solutions for repair costs associated with the fire, and on September 12, 2007, the parties entered into an Agreement Regarding Changes in Equipment and Operations, pursuant to which the Titan entities paid Plaintiff $184,000 related to mutually

agreed upon changes in equipment and operating procedures. *See* Agreement Regarding Changes in Equipment and Operations (September 12, 2007) (attached hereto as Ex. 2). The September 2007 agreement was based in part on an internal investigation of the December 2006 fire conducted by the Titan entities in March 2007 as part of their post-closing obligations. Based on a summary of this investigation, the Titan entities prepared a first draft of the agreement in the summer of 2007, and transmitted it to AL Solutions. The parties thereafter exchanged several drafts of this agreement, and engaged in multiple discussions regarding its terms, over the course of several months. For example, the parties negotiated the cost associated with the design and installation of a new lift system at the former Jamegy facility in West Virginia. The Titan entities had originally proposed a payment of $115,000 related to this system; AL Solutions requested payment in the amount of $129,000. I engaged in several conversations with AL Solutions personnel regarding design and installation issues related to the lift system and to AL Solutions' cost estimate for the same; the Titan entities ultimately agreed to include the amount sought by AL Solutions in the final payment amount of $184,000. The Titan entities conducted these negotiations, executed the agreement, and authorized the $184,000 payment, from their Oregon headquarters.

21.     The Titan entities are actively managing their rights and obligations with respect to each of the foregoing post-closing covenants from their offices in Portland, Oregon. Moreover, since their relocation to Portland, Oregon, the Titan entities have considered new opportunities for growth consistent with their non-competition obligations under the APA. For example, the Titan entities have contemplated providing consulting services to metals companies regarding the recovery of nickel and cobalt from certain contaminated metal scrap streams using a process technology developed by Joseph Megy (US Patent 5,827,349). The recovered nickel and cobalt have value in market segments and in applications which lie outside the areas covered

by the APA's non-compete provision.  As of this date, the Titan entities have not pursued a

consulting business based on this technology.  Nevertheless, the Titan entities will continue to

consider this and other opportunities.

22.    I have reviewed the Declaration of John Boyle filed in support of plaintiff

AL Solutions' Motion to Remand [Docket No. 8] (the "Boyle Declaration").  It is my belief that

the Boyle Declaration does not accurately reflect the active nature of the Titan entities or their

principal place of business.  Specifically, and as detailed herein, Mr. Boyle's contentions that (1)

the "Defendants were not engaged in any ongoing business activities, but were merely awaiting

resolution of this lawsuit and payment of any final amounts due under the Asset Purchase

Agreement before winding up their operations"; (2) "neither Defendant maintains a separate

corporate office in Oregon"; (3) "Defendants have no active employees"; (4) the "Defendants are

no longer actively transacting any of their usual corporate business and have not transact[ed] any

such business in Oregon"; and (5) the APA's non-compete clause "effectively barred" the Titan

entities from transacting any of their usual corporate business in Oregon (*see* Boyle Decl. ¶¶ 15,

17-18) are false.

23.    Exhibits A, B, C, and D of the Boyle Declaration include "Business Entity

Data" for the Titan entities located on the Oregon Secretary of State's website.  *See* Boyle Decl.

at Exs. A-D.  These exhibits incorrectly list the "principal place of business" for the Titan entities

as "100 South Chester Street, New Cumberland, West Virginia 26047."  As set forth in

paragraph 5 above, the former Jamegy manufacturing facility that plaintiff AL Solutions

acquired pursuant to the APA is located at that address.  The Titan entities conducted no business

at that address, and AL Solutions alone has operated that facility since late December 2006.

24.    It appears the "principal place of business" information set forth at Boyle

Exhibits A and B is based on filings dated January 18, 2007.  It appears that the "principal place

of business" information set forth at Boyle Exhibits C and D is based on filings dated January 17, 2008. I prepared these January 2008 filings without consulting a lawyer. In the January 2008 filings, I updated the entities' mailing address and the address of their President to reflect their location in Portland, Oregon, but neglected to update the address of the entities' principal place of business.

25.     On June 30, 2008, I transmitted the requisite forms to the Oregon Secretary of State correcting the Titan entities' principal place of business information to read "1001 NW Lovejoy, Unit 705, Portland, Oregon 97209" (attached hereto as Ex. 3).

26.     Exhibits E and F of the Boyle Declaration include "Business Entity Data" for the Titan entities located on the West Virginia Secretary of State's website. *See* Boyle Decl. at Exs. E-F. This data lists Portland, Oregon as the Titan entities' principal office address. *Id.* The Titan entities maintain this information on the West Virginia Secretary of State's website based on the advice of the companies' accountant related to certain tax obligations the Titan entities incur in West Virginia as the entities satisfy their obligations with respect to the Retained Liabilities and indemnification claims. The asset sale on December 29, 2006, and the operations of the business prior to the asset sale, were the events which gave rise to these tax obligations in the state of West Virginia. Since December 29, 2006 the Titan entities have maintained no operations in West Virginia which give rise to new tax obligations; all current and future tax obligations in West Virginia relate to events which occurred on or before December 29, 2006 and the disposition of liabilities associated with such events.

371022/RE

I declare under the penalty of perjury that the foregoing is true and correct. Executed this 22nd day of July, 2008 in Portland, Oregon.

Devin Megy

# EXHIBIT 1

## JAMEGY, INC.

### DISCLOSURE SCHEDULE

This disclosure schedule ("***Disclosure Schedule***") is being furnished by Jamegy, Inc. and Jamegy WV, Inc. (collectively, "*Seller*") to Al Solutions, Inc. ("*Purchaser*") in connection with the execution and delivery of that certain Asset Purchase Agreement dated as of December 29, 2006 between Seller and Purchaser (the "*Agreement*"). Unless the context otherwise requires, all capitalized terms used in this Disclosure Schedule shall have the respective meanings assigned to them in the Agreement.

No reference to or disclosure of any item or other matter in this Disclosure Schedule shall be construed as an admission or indication that such item or other matter is material or that such item or other matter is required to be referred to or disclosed in this Disclosure Schedule. No disclosure in this Disclosure Schedule relating to any possible breach or violation of any agreement, law or regulation shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.

This Disclosure Schedule and the information and disclosures contained in this Disclosure Schedule are intended only to qualify and limit the representations, warranties and covenants of Seller contained in the Agreement and shall not be deemed to expand in any way the scope or effect of any of such representations, warranties or covenants.

The contents of all documents referred to in this Disclosure Schedule are incorporated by reference in this Disclosure Schedule as though fully set forth in this Disclosure Schedule. Any information described in this Disclosure Schedule under any paragraph or section number shall be deemed disclosed and incorporated into any other paragraph or section number where it is reasonably apparent such disclosure applies.

The bold-faced headings contained in this Disclosure Schedule are included for convenience only, and are not intended to limit the effect of the disclosures contained in this Disclosure Schedule or to expand the scope of the information required to be disclosed in this Disclosure Schedule.

**Schedule 1.3(b) Certain Retained Liabilities**

Reference is made to the following Retained Liabilities, in addition to those set forth in Section 1.3(b) of the Agreement:

(1)   Liabilities related to the matter described in Schedule 1.4(c)(1)

(2)   Liabilities arising directly from the matter described in Schedule 1.4(c)(2)

(3)   Environmental liabilities relating to conditions existing or acts or omissions occurring prior to Closing.

(4)   Liabilities relating to the OSHA Stipulation of Settlement dated December 18, 2006.

(5)   Liabilities relating to any employee (including, without limitation, salary, vacation and sick days) through the Closing Date.

(6)   Any bonus or incentive payments to any consultant or employee of Seller, including, without limitation, bonus payments and payments related to elections under Section 83(b) of the Code to the following individuals:

    (i)     E. Niles Kenyon

    (ii)    David Whitehead

    (iii)   Mark Vignovic

    (iv)   Frank Roberts

(7)   Any accounts payable of Seller as of Closing and which are *not* included on the Final Closing Working Capital

(8)   Liabilities arising prior to Closing, if any, that relate to the handling of certain flammable and toxic materials in contravention of the standards set forth in National Fire Protection Association ("NFPA") Standards 481 and 482 for titanium and zirconium.

(9)   Liabilities related to the Duff & Phelps Securities, LLC ("Duff & Phelps") transaction payoff letter dated December 28, 2006; the Engagement Letter dated December 5, 2005 and the amendment thereto dated May 5, 2006 entered into between Duff & Phelps and Jamegy and the related indemnification letter agreement, dated December 28, 2006, by and among Duff & Phelps, Devin Megy and Joseph Megy.

7080/73489-001 Current/9157664v4

**Schedule 1.4(c)  Specific Claims**

Reference is made to:

(1)    the summons and complaint dated November 8, 2006 and filed in the Circuit Court of Hancock County, West Virginia, in connection with Civil Action no. 06-C-235-W, and

(2)    that certain fire incident that occurred in the production building of Seller's Facilities in New Cumberland, West Virginia, on December 21, 2006.

# EXHIBIT 2

## AGREEMENT REGARDING CHANGES IN EQUIPMENT AND OPERATIONS

This **AGREEMENT REGARDING CHANGES IN EQUIPMENT AND OPERATIONS** (*"Agreement"*) is entered into as of September 12, 2007 by and among **TITAN HOLDINGS, INC.**, an Oregon corporation (*"Titan Holdings"*), its wholly owned subsidiary **TITAN HOLDINGS WV, INC.**, an Oregon corporation (*"Titan Holdings WV"*, and together with Titan Holdings, *"Seller"*), the stockholders of Titan Holdings, Inc. (and together with the Seller, *"Seller Affiliated Parties"*) and **AL SOLUTIONS, INC.**, a Delaware corporation (*"Purchaser"*) and its parent company, **TYGEM HOLDINGS, INC.**, a Delaware corporation (together with the Purchaser, *"Purchaser Affiliated Parties"*).

In consideration of the recitals set forth below, which are contractual, and the other terms and conditions contained herein, the parties agree as follows:

### 1. RECITALS

**1.1** Seller and Purchaser entered into an *"Asset Purchase Agreement"* on December 29, 2006 (*"Close Date"*), under which the Seller agreed to sell substantially all Sellers' assets to Purchaser. Titan Holdings and Titan Holdings WV are successor corporations to Jamegy, Inc. and Jamegy WV, Inc., respectively, identified collectively as the Seller in the Asset Purchase Agreement.

**1.2** All defined terms used herein but not defined herein shall have the definitions set forth in the Asset Purchase Agreement.

**1.3** The term "Production Building" refers to the cement building on the north end of Purchaser's site in New Cumberland, West Virginia and houses Purchaser's mill processing operations and other manufacturing operations.

**1.4** The term "Lift System" refers to two lift units; each lift unit is designed to raise and lower a mill processing motor (and include a connecting shaft and cutting blade). The two lift units comprise the "Lift System." Subsequent to the Close Date, Seller retained liability for the installation of a Lift System pursuant to Section 1.3(b), and specifically referenced in *Schedule 1.3(b)(4) Liabilities relating to the OSHA Stipulation of Settlement dated December 18, 2006* (see Exhibit A), of the Asset Purchase Agreement.

### 2. CHANGES IN EQUIPMENT AND OPERATIONS

**2.1** **Lift System.** Seller and Purchaser have agreed, and have worked together in good faith, on the design and installation of the Lift System in the mill processing area of the Production Building. Purchaser has incurred certain costs associated with the design, cost of equipment, cost of materials, fabrication, installation, and testing of the Lift System. Any costs associated with the Lift System that have not already been incurred by Purchaser have been estimated and agreed upon by Seller and Purchaser. The total estimated and incurred cost associated with the Lift System is shown in the schedule of changes shown in Section 2.3 of this Agreement (*"Schedule of Changes"*). Other than the total cost for the Lift System shown in the Schedule of Changes, Purchaser agrees and covenants that none of the Seller Affiliated Parties shall be liable, in whole or in part, for the cost of any future equipment procurement, installation, design changes, maintenance, repair, testing, replacement of parts or equipment or any other costs associated with the Lift System.

Purchaser shall be responsible for making any required changes to standard operating procedures, work instructions, modifications to quality manuals, to safety manuals, and to any other relevant documentation affected by the installation of the Lift System. Purchaser shall also be responsible for making any required changes to safety training of its workers, notification of appropriate regulatory agencies, or any other impact the Lift System may have on the Business.

**2.2    Required Changes.**  Seller and Purchaser have agreed, and have worked together in good faith, to identify specific changes in the equipment and operations used by Purchaser to conduct Business of the Purchaser. Seller and Purchaser hereby represent their mutual belief that Required Changes in the Business, shown in Section 2.3 of this Agreement, are prudent and are commercially reasonable in light of the December 2006 Fire. The Required Changes were identified in a review of Purchaser equipment, operations, and safety practices conducted by consultants (including Joseph Megy, Gary Powers, and Mark Vignovic) in February of 2007. For a description of Required Changes, see Exhibit B.

Seller and Purchaser have worked together in good faith to estimate the total cost of design, cost of equipment, cost of materials, fabrication, installation, and testing of all Required Changes (pursuant to Section 4.1(c)(iv)(B) of the Asset Purchase Agreement). Taken as a whole, these costs comprise the Required Change Costs (and are shown in the Schedule of Changes below as *Total Required Change Costs*). Purchaser agrees and covenants that none of Seller Affiliated Parties shall be liable, in whole or in part, for the cost of any future equipment procurement, installation, design changes, maintenance, repair, testing, replacement of parts or equipment or any other costs associated with the Required Changes *other than those costs* shown in the Schedule of Changes below.

Purchaser shall be responsible for making any required changes to standard operating procedures, work instructions, modifications to quality manuals, to safety manuals, and to any other relevant documentation affected by the Required Changes. Purchaser shall also be responsible for making any required changes to safety training of its workers, notification of appropriate regulatory agencies, or any other impact the Required Changes may have on the Business.

**2.3**    Seller and Purchaser have agreed to the total costs shown below for the Lift System and for the Required Changes (Required Change Costs):

### Schedule of Changes

| | |
|---|---|
| *Total Lift System Costs* | *$ 129,000* |
| Required Changes | |
|     Variable Drive Motor Control | $ 25,000 |
|     Emergency Exit from Mill Platforms | 15,000 |
|     New Raw Material Source Inspection | 7,500 |
|     Water Sprays for Mill Processing Vents | 5,000 |
|     Automatic Notification of Emergency Services | 2,500 |
| *Total Required Change Costs* | *$ 55,000* |
| ***Grand Total (All Costs)*** | ***$ 184,000*** |

For a description of Required Changes, see Exhibit B. The parties acknowledge that a substantial portion of the work required to design, fabricate, install, and test the changes shown in the Schedule of Changes above has not been completed as of the date of this Agreement. Seller Affiliated Parties and Purchaser covenant and agree that costs shown in the schedule above represent the final and complete amount which Seller must reimburse Purchaser, even though certain costs associated with changes listed in the Schedule of Changes have been estimated. Purchaser represents that it is responsible (and the Seller Affiliated Parties shall bear no responsibility) for undertaking the remaining activities necessary to design, fabricate, install, and test (and to purchase any equipment and materials as needed) the changes shown above. Purchaser covenants that Seller's reimbursement to Purchaser for the total amount shown in the table above (**$184,000**) represents a reasonable and fair payment to Purchaser for the full and complete implementation and testing of changes shown in the Schedule of Changes.

For the avoidance of doubt, Purchaser covenants that changes to equipment and operations shown in the Schedule of Changes shall be deemed to have *no net impact* on the cost structure of Purchaser's business and therefore *no* payment associated with a change in the cost structure shall be assessed to Seller Affiliated Parties (see Section 4.1(c)(iv)(B) of the Asset Purchase Agreement).

3.    **PAYMENT TO PURCHASER**

**3.1**    Seller shall pay to Purchaser the amount of **one hundred and eighty four thousand dollars ($184,000)** within five (5) business days of the execution of this Agreement. Such payment shall constitute the full and complete obligation of Seller Affiliated Parties to Purchaser with respect to the changes shown in the Schedule of Changes and upon receipt of such Payment, Purchaser shall release the Seller Affiliated Parties from any obligations under Section 1.3(b), and *Schedule 1.3(b)(4) Liabilities relating to the OSHA Stipulation of Settlement dated December 18, 2006*, of the Asset Purchase Agreement .

**3.2**    Seller Affiliated Parties and Purchaser Affiliated Parties agree that Seller's reimbursement of Purchaser for the changes in the Schedule of Changes qualifies for Permitted Use of Funds and shall therefore be paid to Purchaser from a bank account established at PNC Bank and funded on the Close Date with five million dollars ($5,000,000), pursuant to *Section 5.4 No Dissolution; Capitalization* of the Asset Purchase Agreement.

4.    **MISCELLANEOUS**

**4.1**    **Counterparts.**  This Agreement may be executed in counterparts, each of which will constitute an original and all of which, when taken together, will constitute one agreement.

**4.2**    **No Prejudice.**  Nothing in this Agreement shall prejudice the ability of the parties to mutually determine and agree upon additional changes in the future (other than those covered in the Schedule of Changes in this Agreement), pursuant to Section 4.1(c)(iv)(B) of the Asset Purchase Agreement.

**4.2**    **Choice of Law.**  The legal interpretation of this Agreement shall be governed by the laws of the State of New York.

**4.3**    **Governing Agreement**.  This Agreement sets forth the governing agreement and understanding of the parties relating to the subject matter herein, and supersedes

all prior agreements, arrangements and understandings, written or oral, between the parties. If there are any conflicts between this Agreement and the Asset Purchase Agreement with respect to the subject matter herein, this Agreement shall govern.

IN WITNESS WHEREOF, the Seller Affiliated Parties and Purchaser Affiliated Parties have executed this Agreement effective as of the date first written hereinabove.

SELLER AFFILIATED PARTIES:

Titan Holdings, Inc. and all subsidiaries

By: _____
Devin Megy, CEO

By: _____
Joseph Megy, Chairman

Remainder Trusts of the Joseph A.
Megy Grantor Retained Annuity Trust

By: _____
Joseph Megy, Trustee

PURCHASER AFFILIATED PARTIES:

Al Solutions, Inc.

By: _____
E. Niles Kenyon, CEO

Tygem Holdings, Inc.,
parent of Al Solutions, Inc.

By: _____
Henry B. Goddard III, President

all prior agreements, arrangements and understandings, written or oral, between the parties. If there are any conflicts between this Agreement and the Asset Purchase Agreement with respect to the subject matter herein, this Agreement shall govern.

IN WITNESS WHEREOF, the Seller Affiliated Parties and Purchaser Affiliated Parties have executed this Agreement effective as of the date first written hereinabove.

**SELLER AFFILIATED PARTIES:**

Titan Holdings, Inc. and all subsidiaries

By: _____
    Devin Megy, CEO

By: _____
    Joseph Megy, Chairman

Remainder Trusts of the Joseph A. Megy Grantor Retained Annuity Trust

By: _____
    Joseph Megy, Trustee

**PURCHASER AFFILIATED PARTIES:**

Al Solutions, Inc.

By: _____
    E. Niles Kenyon, CEO

Tygem Holdings, Inc., parent of Al Solutions, Inc.

By: _____
    Henry B. Goddard III, President

all prior agreements, arrangements and understandings, written or oral, between the parties. If there are any conflicts between this Agreement and the Asset Purchase Agreement with respect to the subject matter herein, this Agreement shall govern.

IN WITNESS WHEREOF, the Seller Affiliated Parties and Purchaser Affiliated Parties have executed this Agreement effective as of the date first written hereinabove.

SELLER AFFILIATED PARTIES:

Titan Holdings, Inc. and all subsidiaries

By: _____
    Devin Megy, CEO

By: _____
    Joseph Megy, Chairman

Remainder Trusts of the Joseph A.
Megy Grantor Retained Annuity Trust

By: _____
    Joseph Megy, Trustee

PURCHASER AFFILIATED PARTIES:

AI Solutions, Inc.

By: _____
    E. Niles Kenyon, CEO

Tygem Holdings, Inc.,
parent of AI Solutions, Inc.

By: _____
    Henry B. Goddard III, President

# EXHIBIT A

## OSHA STIPULATION OF SETTLEMENT

(see attached agreement)

## EXHIBIT B

### DESCRIPTION OF REQUIRED CHANGES

**Variable Drive Motor Control.**  Refers to the installation of a variable drive control system for each of the (two) electrical motors, which are part of the mill processing equipment. Installation of a variable drive control system allows Purchaser to control the operating speed of each motor, as well as the start-up speed profile.

**Emergency Exit from Mill Platforms.**  Refers to the installation of an emergency exit from the platforms in the mill processing area. The exit should allow those in the mill processing area to exit directly from the platforms, at platform level, to the exterior of the Production Building in the case of fire or other emergency.

**New Raw Material Source Inspection.**  Refers to the inspection of new raw material sources on site until Purchaser can confirm the new supplier has implemented acceptable segregation and storage procedures at the supplier's site.

**Water Sprays for Mill Processing Vents.**  Refers to the installation of water sprays in the off-take vents above the mill processing tanks. The water sprays will be installed on the interior of the vents to allow for the periodic cleaning of metal fines from the interior surfaces of the vents.

**Automatic Notification of Emergency Services.**  Refers to configuration of the fire alarm to automatically dial 911 when the fire suppression system is activated.

Dec-18-06 02:59pm From-STEPTOE &JOHNSON   Case 1:08-cv-05105-LJO   Document 14-3   Filed 07/22/2008   Page 10 of 13   9045988116   T-429   P.02/05   F-550

Dec-18-06 02:58pm From-STEPTOE &JOHNSON   9045988116   T-429   P.02/05   F-549

UNITED STATES OF AMERICA
OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION

ELAINE L. CHAO,                :     OSHRC DOCKET
SECRETARY OF LABOR,
UNITED STATES DEPARTMENT OF LABOR,     :     NO. 06-1747

                   Complainant,     :     INSPECTION

    v.                             :     NO. 309473429

JAMEGY, INC., and its successors        :
                                  :
                Respondent.     :

## STIPULATION OF SETTLEMENT

Complainant Elaine L. Chao, Secretary of Labor, United States Department of Labor, and

Respondent Jamegy, Inc., through their respective undersigned counsel, in order to conclude this

matter without the necessity of further litigation, herein agree and stipulate as follows:

1.     Complainant amends her Citation and Notification of Proposed Penalty issued on

September 21, 2006, as follows:

         a.    Citation 1 Item 1a through Item m are vacated and replaced by Item 1 which

will read in its entirety as follows:

29 CFR 1910.146(c)(7)(iii): The employer did not document the basis for determining
that all hazards in a permit space had been eliminated, through a written certification that
contained the date, the location of the space, and the signature of the person making the
determination:

a.    The employer did not document the basis for determining that all hazards had been
eliminated from the Milling Tank prior to an employee entering the tank on or about July
18, 2006.

1

As amended Item 1 is a serious violation with a penalty of $1500.00. Full abatement of Item 1, as amended, has been accomplished by the following actions of Respondent:

> The mill tank has been re-designed to include a butterfly valve at the very bottom to ensure material can be flushed from the tank without the need for employee entry. Further, Respondent has implemented procedures to ensure that the saw blade change and screen change are done under the safest feasible conditions. Further, Respondent will install a lifting system by March 30, 2007, to allow the blade changes from outside the tank.

    b. <u>Citation 1 Item 2</u> is deleted.

    c. <u>Citation 1, Item 3</u> remains as issued with a penalty of $600.00.

    d. <u>Citation 1, Item 4</u> remains as issued with a penalty of $1500.00.

    e. <u>Citation 1, Grouped Item 5a and 5b</u> remains as issued with a penalty of $1500.00.

2.    Respondent withdraws its Notice of Contest to the Citation and Notification of Proposed Penalty as amended by this Stipulation.

3.    Respondent also represents:

    a.    that it has posted its Notice of Contest;

    b.    that the total amended penalty of $5100.00 will be paid within thirty (30) days of the approval by the Administrative Law Judge of this Stipulation of Settlement and Respondent shall forward payment to the Charleston, West Virginia Area Office of OSHA at 405 Capitol Street, Suite 407, Charleston, West Virginia 25301 payable to "OSHA-Labor."

    c.    that a copy of this Stipulation of Settlement and the Citation issued on September 21, 2006 have been posted in accordance with the requirements of 29 C.F.R. § 2200.100(c) and 29 C.F.R. § 2200.7(g) so as to provide notice to all affected employees at

<u>THE WORK SITE</u> (location where all affected employees will receive notice) on <u>12/18</u>, 2006;

2

Dec-18-06 04:30pm From-STEPTOE & JOHNSON 3045888116 T-427 P.04/05 F-550

Dec-18-06 02:58pm From-STEPTOE & JOHNSON 3045888116 T-429 P.04/06 F-545

    d.    that it will continue to comply with the applicable provisions of the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. § 651 *et seq.* ("Act"), and the applicable safety standards pursuant to the Act.

    4.    The Citation and Notification of Proposed Penalty as amended by this Stipulation of Settlement shall become a final Order of the Commission, and the parties consent to the entry of the attached Consent Order Approving Settlement.

    5.    None of the foregoing agreements, stipulations, or actions taken by respondent shall be deemed an admission by respondent of any of the allegations contained in the Citation, Notification of Penalty and the Complaint herein. The agreements, statements, stipulations, findings and actions herein are made solely for the purpose of settling this matter economically and amicably without further litigation and shall not be used for any purpose except for proceedings and matters arising under the Occupational Safety and Health Act of 1970.

6.      Each party agrees to bear its own attorneys' fees, costs and other expenses

incurred by such party in connection with any stages of the above-referenced proceeding

including, but not limited to, attorneys' fees and costs which may be available under the Equal

Access to Justice Act, as amended.

Respectfully submitted,

JAMEGY, INC                                      U. S. DEPARTMENT OF LABOR

                                                 Howard M. Radzely
                                                 Solicitor of Labor

                                                 Catherine Oliver Murphy
                                                 Regional Solicitor

By: _____               By: _____
    David E. Dick                            Myrna A. Butkovitz
    Steptoe & Johnson PLLC                   Regional Counsel - OSHA
    United Center Suite 400                  The Curtis Center, Suite 630 East
    1085 Van Voorhis Road                    170 S. Independence Mall West
    Morgontown, WV 26507                     Philadelphia, PA 19106

    Attorney for Respondent                  Attorneys for Complainant

Dated: __12/18/06__

4

# EXHIBIT 3

Phone: (503) 986-2200
Fax: (503) 378-4381

**Amendment to Annual Report**

Secretary of State
Corporation Division
255 Capitol St. NE, Suite 151
Salem, OR 97310-1327
FilingInOregon.com

- [ ] Professional Corporation
- [ ] Nonprofit Corporation
- [x] Business Corporation
- [ ] Cooperative
- [ ] Water District

**REGISTRY NUMBER:** 247837-89

**ENTITY TYPE** [x] DOMESTIC   [ ] FOREIGN

In accordance with Oregon Revised Statute 192.410-192.490, the information on this application is public record.
We must release this information to all parties upon request and it will be posted on our website.      For office use only

Please Type or Print Legibly in **Black** Ink.

**To change the Registered Agent, use Change of Registered Agent/Address, Form 131**

1) **NAME OF ENTITY**   Titan Holdings, Inc.

2) **PRINCIPAL PLACE OF BUSINESS**

1001 NW Lovejoy, Unit 705

Portland, OR 97209

United States of America

3) **ADDRESS FOR MAILING NOTICES**

P.O. Box 1417

Portland, OR 97207

United States of America

**OFFICERS NAME AND ADDRESSES**

4) **PRESIDENT** (Name and Address)

Devin Megy

1001 NW Lovejoy, Unit 705

Portland, OR 97209

United States of America

5) **SECRETARY** (Name and Address)

Joseph Megy

137 Casa Sueno Court

Richland, WA 99352

United States of America

6) **EXECUTION** (An officer must sign.)

Signature: _Di Megy_

Printed Name: Devin Megy

Title: President

Date: June 30, 2008

7) **CONTACT NAME** (To resolve questions with this filing.)

Devin Megy

**DAYTIME PHONE NUMBER** (Include area code.)

(503) 206-9920

**FEES**

No Processing Fee

139 (Rev. 5/07)

Phone: (503) 986-2200
Fax: (503) 378-4381

**Amendment to Annual Report**

Secretary of State
Corporation Division
255 Capitol St. NE, Suite 151
Salem, OR 97310-1327
FilingInOregon.com

- ☐ Professional Corporation
- ☐ Nonprofit Corporation
- ☑ Business Corporation
- ☐ Cooperative
- ☐ Water District

REGISTRY NUMBER: **364595-84**

ENTITY TYPE    ☑ DOMESTIC    ☐ FOREIGN

In accordance with Oregon Revised Statute 192.410-192.490, the information on this application is public record.
We must release this information to all parties upon request and it will be posted on our website.    For office use only

Please Type or Print Legibly in **Black** Ink.

To change the Registered Agent, use Change of Registered Agent/Address, Form 131

1) NAME OF ENTITY   Titan Holdings WV, Inc.

2) PRINCIPAL PLACE OF BUSINESS
1001 NW Lovejoy, Unit 705
Portland, OR 97209
United States of America

3) ADDRESS FOR MAILING NOTICES
P.O. Box 1417
Portland, OR 97207
United States of America

OFFICERS NAME AND ADDRESSES

4) PRESIDENT (Name and Address)
Devin Megy
1001 NW Lovejoy, Unit 705
Portland, OR 97209
United States of America

5) SECRETARY (Name and Address)
Joseph Megy
137 Casa Sueno Court
Richland, WA 99352
United States of America

6) EXECUTION (An officer must sign.)
Signature: *D. Megy*
Printed Name: Devin Megy
Title: President
Date: June 30, 2008

7) CONTACT NAME (To resolve questions with this filing.)
Devin Megy

DAYTIME PHONE NUMBER (Include area code.)
(503) 206-9920

**FEES**

**No Processing Fee**

139 (Rev. 5/07)