## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------- X
                      :

AL SOLUTIONS, INC.,

              Plaintiff,        :

        vs.             :      Case No. 08 CIV. 5515 (CM)

JAMEGY, INC. a/k/a TITAN HOLDINGS,    :
INC. and JAMEGY WV, INC. a/k/a TITAN
HOLDINGS WV, INC.,         :

        Defendants.

-------------------------------------- X

### ANSWER, DEFENSES, AND COUNTERCLAIMS

Defendants and counterclaimants Titan Holdings, Inc. f/k/a Jamegy, Inc. and Titan Holdings WV, Inc. f/k/a Jamegy WV, Inc. (collectively, "Titan"), by their attorneys, Cooley Godward Kronish LLP, state their answer, defenses, and counterclaims to the complaint of plaintiff and counterclaim-defendant AL Solutions, Inc. ("AL Solutions") as follows:

### SUMMARY OF THE COMPLAINT

1.      The first sentence of the first paragraph of the Complaint sets forth Plaintiff's characterization of the Complaint to which no response is required, and on that basis, Titan denies the allegations in the first sentence of paragraph 1. Titan admits that Exhibit A to the Complaint is a portion of an Asset Purchase Agreement ("APA"), entered into on or about December 29, 2006, by and between AL Solutions, Inc., Jamegy, Inc., Jamegy WV, Inc., and certain stockholders identified in that agreement, as alleged in the second sentence of paragraph 1 of the Complaint. Except as expressly admitted herein, Titan denies each and every remaining allegation in paragraph 1 of the Complaint

2.      Titan denies the allegations in paragraph 2 of the Complaint.

3.      Titan admits the allegations in paragraph 3 of the Complaint, but states that the Ty-Gem brand name refers to a family of products and not to an individual product.  The Ty-Gem product family included Ty-Gem AG, Ty-Gem B, and other Ty-Gem products.

4.      Titan admits that it produced titanium alloying addition products under the Ty-Gem product family brand name.  The Ty-Gem products produced by Titan were not made – on average – almost entirely, or even predominantly, of commercially pure scrap titanium.  Titan used a patented and proprietary process to convert certain titanium scrap materials into titanium alloying products it sold under the Ty-Gem brand name. Except as expressly admitted herein, Titan denies each and every remaining allegation in paragraph 4 of the Complaint.

5.      Titan denies the allegations in paragraph 5 of the Complaint.

6.      Titan is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 6 of the Complaint concerning Plaintiff's knowledge, and therefore denies such allegations in paragraph 6.  Titan denies each and every remaining allegation in paragraph 6 of the Complaint.

7.      Titan admits that the APA sets forth certain "Representations and Warranties of Seller," and respectfully refers the Court to Section 2.0 of the APA for a complete and accurate statement of its contents.  Except as expressly stated therein and admitted herein, Titan denies each and every remaining allegation in paragraph 7 of the Complaint.

8.      Paragraph 8 of the Complaint sets forth compound legal conclusions as to which no pleading response is required.  To the extent that a further response is deemed required, Titan denies each and every allegation in paragraph 8 of the Complaint.

## PARTIES

9.     Titan is without information or knowledge sufficient to form a belief respecting the allegations set forth in paragraph 9 of the Complaint, and therefor denies the same.

10.     Titan admits the allegations in the first sentence of paragraph 10 of the Complaint. Titan denies the second sentence of paragraph 10 of the Complaint, and states that the name change referenced in this sentence occurred on or about January 11, 2007.

11.     Titan admits the allegations in the first sentence of paragraph 10 of the Complaint. Titan denies the second sentence of paragraph 11 of the Complaint, and states that the name change referenced in this sentence occurred on or about January 11, 2007.

## JURISDICTION AND VENUE

12.     Titan admits that pursuant to the APA provision cited in paragraph 12 of the Complaint, Plaintiff and Defendants agreed to "submit to the jurisdiction of the state courts of New York and the jurisdiction of the United States District Court for the Southern District of New York for the purpose of any suit, action or other proceedings arising out of or based upon this Agreement. . . ." APA § 6.5. Titan respectfully refers the Court to Section 6.5 of the APA for a complete and accurate statement of its contents. Except as expressly admitted herein, Titan denies each and every remaining allegation in paragraph 12 of the Complaint.

13.     Titan admits that pursuant to the APA provision cited in paragraph 13 of the Complaint, Plaintiff and Defendants agreed to not assert "that the venue of the suit, action or proceeding [brought in the state courts of New York or the United States District Court for the Southern District of New York consistent with the terms of the APA] is improper . . . ." APA § 6.5. Titan respectfully refers the Court to Section 6.5 of the APA for a complete and accurate statement of its contents. Except as expressly admitted herein, Titan denies each and every remaining allegation in paragraph 13 of the Complaint.

## FACTUAL BACKGROUND

14.     Titan admits that that the entity formerly known as Jamegy, Inc. was founded in 1991. Except as expressly admitted herein, Titan denies each and every remaining allegation in paragraph 14 of the Complaint

15.     Titan admits it used its patented and proprietary process to convert certain titanium scrap materials into one or more titanium alloying addition products; these products were sold under the Ty-Gem brand name. The Ty-Gem product family included Ty-Gem AG, Ty-Gem B, and other Ty-Gem products. These products were sold to aluminum producers and played a role in the grain refinement of aluminum and aluminum alloys; grain refinement provides aluminum and aluminum alloys with characteristics such as strength and malleability. The largest customers of Ty-Gem products, as a percentage of total pounds of Ty-Gem sold in 2006, were: (a) Alcoa, with approximately 50 percent; (b) Wabash, with approximately 13 percent; and (c) Alcan, with approximately 9 percent. Except as expressly admitted herein, Titan denies each and every remaining allegation in paragraph 15 of the Complaint.

16.     The Ty-Gem brand name refers to a family of products and not to an individual product. Taken as a whole, Titan admits that Ty-Gem products, by revenue and by volume, were its most significant products. At times in the past, Titan has referred to the combined sales of its titanium and zirconium alloying addition products as *core product sales*. Titan admits that Ty-Gem sales accounted for approximately 75 percent of Titan's core product sales in 2005, and projected that Ty-Gem sales would account for 85 percent of Titan's core product sales in 2007, and 87 percent of Titan's core product sales in 2008. Except as expressly admitted herein, Titan denies each and every remaining allegation in paragraph 16 of the Complaint.

17.     Titan admits that in a formal presentation delivered to the Plaintiff in or around September 2006, Titan described the commercial and competitive advantages of its Ty-Gem

4

products.  The Ty-Gem brand name refers to a family of products and not to an individual

product.  Titan denies the allegations in the second sentence of paragraph 17 of the Complaint.

Except as expressly admitted herein, Titan denies each and every remaining allegation in

paragraph 17 of the Complaint.

18.    Titan denies the allegations in paragraph 18 of the Complaint.

19.    Titan admits that it estimated, as qualified by its knowledge and by disclosure of

the method of calculation it used to obtain its estimate, that approximately 12.1 million pounds

fine and ultra fine titanium scrap material, appropriate for use in the Titan production process

and in Ty-Gem products, was generated by titanium mill processors in 2006.  Titan procured

approximately 1.4 million pounds of fine and ultra fine titanium scrap material from suppliers in

2006.  Except as expressly admitted herein, Titan denies each and every remaining allegation in

paragraph 19 of the Complaint.

20.    Titan denies the allegations in paragraph 20 of the Complaint.

21.    Titan admits that it described its Ty-Gem products as appropriate for the "high

performance" market segment.  Except as expressly admitted herein, Titan denies each and every

remaining allegation in paragraph 21 of the Complaint.

22.    Titan denies the allegations in paragraph 22 of the Complaint.

23.    Titan denies the allegations in paragraph 23 of the Complaint.

24.    Titan denies the allegations in paragraph 24 of the Complaint.

25.    Titan denies the allegations in paragraph 25 of the Complaint.

26.    Titan denies the allegations in paragraph 26 of the Complaint.

27.    Titan denies the allegations in paragraph 27 of the Complaint.

28.    Titan denies the allegations in paragraph 28 of the Complaint.

29.     Titan denies the allegations in paragraph 29 of the Complaint.

30.     Titan denies the allegations in paragraph 30 of the Complaint.

31.     Titan denies the allegations in paragraph 31 of the Complaint.

32.     Titan denies the allegations in paragraph 32 of the Complaint.

33.     Paragraph 33 of the Complaint sets forth compound legal conclusions as to which no pleading response is required.  To the extent that a further response is deemed required, Titan denies each and every allegation in paragraph 33 of the Complaint.

34.     Titan admits that on or about December 29, 2006, pursuant to the APA and related documents, AL Solutions purchased "substantially all of Seller relating to, used or held for use by Seller in connection with the manufacture, sale, marketing for sale, licensing of alloying products, process technologies and services for the aluminum industry, including, but not limited to, titanium, zirconium and grain refinement technology, products and services and dry grinding replacement technology."  APA "Recital" and § 1.1.  Titan respectfully refers the Court to the Recital of the APA and to Section 1.1 of the APA for a complete and accurate statement of their contents.  Except as expressly admitted herein, Titan denies each and every remaining allegation in paragraph 34 of the Complaint.

35.     Titan admits that the block quote recited in paragraph 35 accurately quotes certain language excised and removed from the full content of Paragraph 2.15 of the APA.  Titan respectfully refers the Court to Section 2.15 of the APA for a complete and accurate statement of its contents.  Except as expressly admitted herein, Titan denies each and every remaining allegation in paragraph 35 of the Complaint.

36.    Paragraph 36 of the Complaint alleges compound legal conclusions to which no pleading response is required.  To the extent that a further response is deemed required, Titan denies each and every allegation in paragraph 36 of the Complaint.

37.    Titan admits that the block quote recited in paragraph 37 accurately quotes certain language excised and removed from the full content of Paragraph 2.14 of the APA.  Titan respectfully refers the Court to Section 2.14 of the APA for a complete and accurate statement of its contents.  Except as expressly admitted herein, Titan denies each and every remaining allegation in paragraph 37 of the Complaint.

38.    Titan admits that that the Ty-Gem B and BM specification changes were communicated to customers.  Titan further states that paragraph 38 of the Complaint alleges compound legal conclusions to which no pleading response is required.  To the extent that a further response is deemed required, and except as expressly admitted herein, Titan denies each and every allegation in paragraph 38 of the Complaint.

39.    Titan denies the allegations in paragraph 39 of the Complaint.

40.    Titan admits that the block quote recited in paragraph 40 accurately quotes certain language excised and removed from the full content of Paragraph 2.23 of the APA.  Titan respectfully refers the Court to Section 2.23 of the APA for a complete and accurate statement of its contents.  Except as expressly admitted herein, Titan denies each and every remaining allegation in paragraph 40 of the Complaint.

41.    Paragraph 41 of the Complaint alleges compound legal conclusions to which no pleading response is required.  To the extent that a further response is deemed required, Titan denies each and every allegation in paragraph 41 of the Complaint.

42.     Titan admits that the block quote recited in paragraph 42 contains certain language excised and removed from the full content of Section 2.18(c) of the APA, but states that such block quote omits language essential for a proper understanding and construction of that paragraph.  Titan respectfully refers the Court to Section 2.18(c) of the APA for a complete and accurate statement of its contents.  Except as expressly admitted herein, Titan denies each and every remaining allegation in paragraph 42 of the Complaint.

43.     Paragraph 43 of the Complaint alleges compound legal conclusions to which no pleading response is required.  To the extent that a further response is deemed required, Titan denies each and every allegation in paragraph 43 of the Complaint.

44.     Titan admits that the block quote recited in paragraph 44 accurately quotes certain language excised and removed from the full content of Section 2.12 of the APA.  Titan respectfully refers the Court to Section 2.12 of the APA for a complete and accurate statement of its contents.  Except as expressly admitted herein, Titan denies each and every remaining allegation in paragraph 44 of the Complaint.

45.     Paragraph 45 of the Complaint alleges compound legal conclusions to which no pleading response is required.  To the extent that a further response is deemed required, Titan denies each and every allegation in paragraph 45 of the Complaint.

46.     Titan admits that the block quote recited in paragraph 46 contains certain language excised and removed from the full content of Paragraph 2.7 of the APA, but states that such block quote omits language essential for a proper understanding and construction of that paragraph.  Titan respectfully refers the Court to Section 2.7 of the APA for a complete and accurate statement of its contents.  Except as expressly admitted herein, Titan denies each and every remaining allegation in paragraph 46 of the Complaint.

47.     Paragraph 47 of the Complaint alleges compound legal conclusions to which no pleading response is required.  To the extent that a further response is deemed required, Titan denies each and every allegation in paragraph 47 of the Complaint.

48.     Titan admits that the block quote recited in paragraph 48 contains certain language excised and removed from the full content of Section 2.24 of the APA, but states that such block quote omits language essential for a proper understanding and construction of that paragraph.  Titan respectfully refers the Court to Section 2.24 of the APA for a complete and accurate statement of its contents.  Except as expressly admitted herein, Titan denies each and every remaining allegation in paragraph 48 of the Complaint.

49.     Paragraph 49 of the Complaint alleges compound legal conclusions to which no pleading response is required.  To the extent that a further response is deemed required, Titan denies each and every allegation in paragraph 49 of the Complaint.

50.     Titan admits that on or about December 28, 2006, Devin Megy in his capacity as Chief Executive Officer of Jamegy, Inc. and President of Jamegy WV, Inc. executed an Officer's Certificate that stated: "All of the representations and warranties made by the Companies in Section 2 of the Acquisition Agreement, as modified by the schedules to the Acquisition Agreement, are true and correct as of the date hereof, and do not omit to state a material fact required to be stated therein or necessary to make such representations and warranties misleading."  Except as expressly admitted herein, Titan denies each and every remaining allegation in paragraph 50 of the Complaint.

51.     Titan admits that Section 4.1(b) of the APA provides that "[t]he representations and warranties of Seller and the Stockholders set forth in Section 2 will survive the Closing, but will terminate and expire, and will cease to be of any force or effect on the eighteen month

anniversary of the Closing Date . . . ."  Titan respectfully refers the Court to Section 4.1(b) of the

APA for a complete and accurate statement of its contents.  Except as expressly admitted herein,

Titan denies each and every remaining allegation in paragraph 51 of the Complaint.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

52.     Titan incorporates and restates its responses to paragraphs 1 through 51 of the

Complaint as if fully set forth herein.

53.     Titan admits the allegations in paragraph 53 of the Complaint.

54.     Titan is without knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 54 concerning AL Solutions' performance, and therefore

denies each and every such allegation in paragraph 54 of the Complaint.

55.     Titan denies the allegations in paragraph 55 of the Complaint.

56.     Titan denies the allegations in paragraph 56 of the Complaint.

57.     Titan denies the allegations in paragraph 57 of the Complaint.

58.     Titan denies the allegations in paragraph 58 of the Complaint.

## SECOND CAUSE OF ACTION
### (Indemnity)

59.     Titan incorporates and restates its responses to paragraphs 1 through 58 of the

Complaint as if fully set forth herein.

60.     Titan admits that the block quote recited in paragraph 60 contains certain

language excised and removed from the full content of Section 4.1(c) of the APA, but states that

such block quote omits language essential for a proper understanding and construction of that

paragraph.  Titan respectfully refers the Court to Section 4.1(c) of the APA for a complete and

accurate statement of its contents.  Except as expressly admitted herein, Titan denies each and

every remaining allegation in paragraph 60 of the Complaint.

61.    Titan denies the allegations in paragraph 61 of the Complaint.

62.    Titan denies the allegations in paragraph 62 of the Complaint.

## AFFIRMATIVE DEFENSES

Without in any way admitting any of the allegations in the Complaint, and without admitting or suggesting that Titan bears the burden of proof on any of the following issues, as separate and independent affirmative defenses, Titan alleges as follows:

### FIRST AFFIRMATIVE DEFENSE

Plaintiff's Complaint fails to state a claim upon which relief my be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's Complaint fails to satisfy the pleading requirements of Fed. R. Civ. P. 9(b).

### THIRD AFFIRMATIVE DEFENSE

Titan denies that Plaintiff has suffered any injury in fact or damage whatsoever, and further denies that Titan is liable to Plaintiff for any injury or damage claimed or for any injury or damage whatsoever.

### FOURTH AFFIRMATIVE DEFENSE

The damages Plaintiff complains of herein were not caused in whole or in part by Titan.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff has failed to mitigate its damages, if any, or to protect itself from avoidable consequences.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims against Titan are barred because they were not asserted after a reasonable investigation or were otherwise not asserted in good faith.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff is barred from recovery of any damages as against Titan (or is otherwise limited in such recovery) by the express terms of the APA.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff is barred from recovery of any damages as against Titan by reason of Plaintiff's failure to provide Titan with adequate notice of its claims.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff is barred from recovery of any damages as against Titan by reason of the doctrine of laches.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff fails to state a claim against Titan upon which relief may be granted as to costs, attorney's fees, expenses, pre-judgment interest, and post-judgment interest.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff has engaged in conduct and activities sufficient to constitute a waiver of any claims set forth in the Complaint.

## TWELFTH AFFIRMATIVE DEFENSE

Titan has insufficient knowledge or information upon which to form a belief whether it may have additional affirmative defenses.  Titan therefore reserves the right to assert additional defenses in the event future discovery indicates that additional defenses are appropriate.

## PRAYER FOR RELIEF

**WHEREFORE**, Defendants Titan Holdings, Inc. and Titan Holdings WV, Inc., respectfully requests that the Court enter judgment in its favor and against Plaintiff AL Solutions, Inc. as follows:

A.      That Plaintiff take nothing by way of its Complaint;

B.      That this Court dismiss Plaintiff's Complaint with prejudice and deny Plaintiff any relief;

C.      That this Court enter judgment in favor of Titan Holdings, Inc. and Titan Holdings WV, Inc.;

D.      That this Court award Defendants their reasonable attorney's fees, costs and interest; and

E.      That this Court allowing such other and further relief as this Court deems just and proper.

## COUNTERCLAIMS

Defendants and counterclaimants Titan Holdings, Inc. and Titan Holdings WV, Inc. (collectively, "Titan") allege the following counterclaims against plaintiff and counterclaim-defendant AL Solutions, Inc.:

## PARTIES, JURISDICTION, VENUE

1.      Counterclaimant Titan Holdings, Inc. is an Oregon corporation with its principal place of business in Portland, Oregon.  On or about, January 11, 2007, Titan Holdings, Inc. changed its name from Jamegy, Inc.

2.      Counterclaimant Titan Holdings WV, Inc. is an Oregon corporation with its principal place of business in Portland, Oregon.  On or about, January 11, 2007, Titan Holdings WV, Inc. changed its name from Jamegy WV, Inc.  Titan Holdings WV, Inc. is the wholly-owned subsidiary of Titan Holdings, Inc.

3.      Titan is informed and believes and on that basis alleges that counterclaim-defendant AL Solutions, Inc. ("AL Solutions") is a Delaware corporation with its principal place of business in New Cumberland, West Virginia.

4.      This Court has jurisdiction pursuant to 28 U.S.C. §1332 based on diversity of citizenship and an amount in controversy in excess of $75,000.00.

5.      Venue in the United States District Court for the Southern District of New York is conferred by 28 U.S.C. §1391, and a choice of law provision set forth in an agreement between the parties as discussed in paragraphs 6, 7 and 8, below.

6.      Section 6.5 of the APA, which governs the dispute that is the subject matter of this action, provides that the United States District Court for the Southern District of New York (along with the state courts of New York) shall have exclusive jurisdiction over the resolution of any disputes between the parties.

7.      Pursuant to Section 6.5 of the APA, each party to the APA waived any objections based on jurisdiction, venue, forum non conveniens or similar matters.

## BACKGROUND

8.      On or about December 29, 2006, AL Solutions, Titan Holdings, Inc. f/k/a/ Jamegy, Inc., Titan Holdings, WV, Inc. f/k/a Jamegy WV, Inc., and certain stockholders thereof entered into an Asset Purchase Agreement (the "APA"), attached as Exhibit A to Plaintiff's Complaint.

9.      Pursuant to the APA, Titan agreed to sell and AL Solutions agreed to acquire certain assets of and assume certain liabilities of Titan, as more particularly set forth therein.

10.     Pursuant to Section 1.4(c) of the APA, AL Solutions agreed to deposit a portion of the purchase price under the APA into escrow, with JPMorgan Chase Bank, N.A. ("JPMorgan") serving as escrow agent

11.     On or about December 29, 2006, and pursuant to Section 1.4(c) of the APA, AL Solutions, Titan Holdings, Inc. f/k/a/ Jamegy, Inc., and JPMorgan entered into an Escrow

Agreement (the "Escrow Agreement"). The Escrow Agreement set forth additional terms for the maintenance and disbursement of the Escrow Fund. A true and correct copy of the Escrow Agreement is attached to this Counterclaim as Exhibit A.

12.    AL Solutions subsequently deposited the sum of $10,000,000 into escrow with JPMorgan (the $10,000,000 deposit, together with accrued interest thereon, the "Escrow Fund"). Such Escrow Fund was to be released to Titan on the eighteenth month anniversary of the APA's Closing Date, as particularly provided for in Section 1.4(c) of the APA and Section 4(a)(iv) of the Escrow Agreement.

13.    June 29, 2008 was the eighteen month anniversary of the APA's Closing Date. JPMorgan did not release the Escrow Deposit to Titan because, on or about December 18, 2007, AL Solutions delivered to JPMorgan a demand on the Escrow Fund in the amount of $10,000,000 in the form of a Claim Notice (the "Claim Notice"). The Claim Notice set forth AL Solutions' unfounded and false allegations that Titan deliberately and materially breached certain of the APA's representations and warranties.

14.    The effect of the Claim Notice, as set forth in the APA and Escrow Agreement, was that AL Solutions informed JPMorgan that AL Solutions was entitled to possession of the Escrow Fund.

15.    On or about January 2, 2008, pursuant to Section 4.4 of the APA and in response to the Claim Notice, Titan served JPMorgan with an Objection to the Claim Notice (the "Objection").

16.    The effect of the Objection, as set forth in the APA and Escrow Agreement, was that Titan informed JPMorgan that Titan disputed AL Solutions' Claims Notice, and its entitlement to the Escrow Fund.

17.     Based on its receipt of the Claim Notice and the Objection, JPMorgan became obligated per the terms of the APA and Section 4(a)(iii) of the Escrow Agreement to retain and not disperse any disputed portion of the Escrow Deposit until it received either joint written instructions signed by AL Solutions and Titan, or a certified copy of a final, non-appealable order of a court of competent jurisdiction.

18.     Following the transmission of the Claim Notice and the Objection, the parties attempted to resolve their dispute as required by Section 4.4 of the APA.  The parties were unsuccessful.

19.     On or about May 20, 2008, AL Solutions filed a complaint in the Supreme Court of the State of New York, County of New York.  That action was subsequently removed to this Court on June 18, 2008.  AL Solutions' Complaint asserts many of the same unfounded and false allegations set forth in its Claim Notice; namely that Titan deliberately and materially breached certain of the APA's representations and warranties.

20.     On or about June 16, 2008, AL Solutions transmitted the Complaint to JPMorgan, and instructed JPMorgan that it may not distribute the Escrow Fund to Titan until it received joint written instructions signed by AL Solutions and Titan, or a certified copy of a final, non-appealable order of a court of competent jurisdiction.

21.     By submitting its unfounded Claim Notice, and transmitting such notice along with its baseless Complaint to JPMorgan, AL Solutions impermissibly and without justification blocked the scheduled distribution of the Escrow Fund to Titan.  Such distribution was to have been made to Titan on or about June 29, 2008 in accordance with Section 1.4(c) of the APA and Section 4(a)(iv) of the Escrow Agreement.

22.     All conditions precedent to the relief requested herein have been performed, have occurred, or have been waived.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment)

23.     Titan repeats and realleges the allegations of the preceding paragraphs set forth in this Counterclaim as if fully set forth herein.

24.     There is a genuine dispute between the parties as to who is entitled to possession of the Escrow Fund, and in what amount.

25.     There is a bona fide adverse interest between the parties concerning Titan's rights under the APA and Escrow Agreement and its entitlement to the Escrow Fund.

26.     There is a bona fide, actual, present and practical need for a declaration by the Court in that the APA and the Escrow Agreement provide that Titan is entitled to possession of the Escrow Fund under these circumstances but AL Solutions (by submitting its unfounded Claim Notice, and transmitting such notice along with its baseless Complaint to JPMorgan) has impermissibly and without justification blocked the distribution of the Escrow Fund to Titan.

27.     Titan seeks a declaration from the Court that it is entitled to immediate possession of the Escrow Fund, consistent with the terms of the APA and the Escrow Agreement.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

28.     Titan repeats and realleges the allegations of the preceding paragraphs set forth in this Counterclaim as if fully set forth herein.

29.     Titan has fulfilled all of its obligations under the APA and Escrow Agreement.

30.    AL Solutions has failed to perform all of its obligations under the APA and the Escrow Agreement in that AL Solutions has impermissibly and without justification prevented Titan from obtaining possession of the Escrow Fund.

31.    As a direct and proximate result of the foregoing breaches, Titan has suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Counterclaimants Titan Holdings, Inc. and Titan Holdings WV, Inc., respectfully requests that the Court enter judgment in its favor and against Counterclaim-defendant AL Solutions as follows:

**A.**    With respect to the First Cause of Action:

**(1)**    That this Court enter a declaratory judgment that, pursuant to the APA and Escrow Agreement, Titan is entitled to immediate possession of the Escrow Fund, in an amount and manner consistent with Section 1.4(c) of the APA and Section 4(a) of the Escrow Agreement;

**(2)**    That this Court award Titan its reasonable attorney's fees, costs and interest; and

**(3)**    That this Court allow such other and further relief as this Court deems just and proper.

**B.**    With respect to the Second Cause of Action:

**(1)**    That this Court enter judgment in favor of Titan Holdings, Inc. and Titan Holdings WV, Inc. for compensatory damages in an amount to be determined at trial;

**(2)**    That this Court award Titan its reasonable attorney's fees, costs and interest; and

(3)    That this Court allow such other and further relief as this Court deems just

and proper.

These remedies are being pled in the alternative.


Dated: July 28, 2008

Respectfully submitted,

COOLEY GODWARD KRONISH LLP


By: _____

Joseph J. Samarias


Robert R. Vieth (*pro hac vice*)
Joseph J. Samarias (*pro hac vice*)
Hans H. Chen (HC4379)
One Freedom Square
Reston Town Center
11951 Freedom Drive
Reston, VA 20190-5656
(703) 456-8000

Maxine G. Sleeper (MS 9533)
1114 Avenue of the Americas
New York, NY 10036-7798
(212) 479-6000


*Attorneys for Defendants Titan Holdings,*
*Inc. f/k/a Jamegy, Inc. and Titan Holdings,*
*WV, Inc. f/k/a Jamegy WV, Inc.*

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was sent by electronic mail and ECF, this 28th day of July, 2008, to the following counsel for plaintiff:

Michael W. Mitchell, Esq.
John Boyle, Esq.
SKADDEN ARPS SLATE MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036

Joseph J. Samarias

367181/RE

# Exhibit A

*EXECUTION VERSION*

# ESCROW AGREEMENT

Escrow Agreement dated as of this December 29, 2006 (the "*Effective Date*") by and among Purchaser identified on <u>Schedule 1</u> attached hereto ("*Purchaser*"), Seller identified on <u>Schedule 1</u> attached hereto (the "*Seller*") and JPMorgan Chase Bank, N.A. as escrow agent hereunder (the "*Escrow Agent*").

**WHEREAS**, Purchaser, Seller and certain other parties have entered into that certain Asset Purchase Agreement dated as of December 29, 2006 (the "*Purchase Agreement*") pursuant to which Purchaser is acquiring from Seller, and Seller and its affiliates is selling to Purchaser, substantially all of the assets and business of Seller and its affiliates.

**WHEREAS**, as part of the closing of the transactions contemplated by the Purchase Agreement, on the date hereof Purchaser is causing to be delivered to the Escrow Agent the sum of $10,000,000 (the "*Escrow Deposit*"), comprised of (i) $4,500,000 (the "*Litigation Reserve Amount*") set aside in respect of the Specific Claims and (ii) $5,500,000 set aside in respect of all other indemnity claims made by Purchaser Indemnified Parties under the Purchase Agreement.

**WHEREAS**, in connection with the consummation of the transactions contemplated by the Purchase Agreement, Purchaser, Seller and the Escrow Agent are required to execute and deliver an escrow agreement in the form hereof.

**NOW THEREFORE**, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the parties hereto agree as follows:

1.    **Appointment**.  Purchaser and Seller hereby appoint the Escrow Agent as their escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment under the terms and conditions set forth herein.

2.    **Escrow Fund**.  Simultaneous with the execution and delivery of this Escrow Agreement, Seller is depositing with the Escrow Agent the Escrow Deposit, and the Escrow Agent acknowledges receipt thereof.  The Escrow Agent shall hold the Escrow Deposit and, subject to the terms and conditions hereof, shall invest and reinvest the Escrow Deposit and the proceeds thereof (the "*Escrow Fund*") as directed in Section 3.  The Litigation Reserve Amount and all proceeds thereof and therefrom shall be referred to herein as the "*Litigation Reserve Fund*".

3.    **Investment of Escrow Fund**.  During the term of this Escrow Agreement, the Escrow Fund shall be invested and reinvested by the Escrow Agent in the investment indicated on <u>Schedule 1</u> or such other investments as shall be directed in writing jointly by Purchaser and Seller and as shall be acceptable to the Escrow Agent.  The parties to this Escrow Agreement recognize and agree that the Escrow Agent will not provide supervision, recommendations, or advice relating to either the investment of moneys held in the Escrow account or the purchase, sale, retention, or other disposition of any investment described herein.  The Escrow Agent or any of its affiliates may receive compensation with respect to any investment directed hereunder. An agency fee will be assessed in connection with each transaction. Periodic statements will be

provided to Purchaser and Seller reflecting transactions executed on behalf of the Escrow Fund. Purchaser and Seller, upon written request, will receive a statement of transaction details upon completion of any securities transaction in the Escrow Fund without any additional cost. The Escrow Agent shall have the right to liquidate any investments held in order to provide funds necessary to make required payments under this Escrow Agreement. The Escrow Agent shall have no liability for any loss sustained as a result of any investment in an investment indicated on <u>Schedule 1</u> or any investment made pursuant to the instructions of the parties hereto or as a result of any liquidation of any investment prior to its maturity or for the failure of the parties to give the Escrow Agent instructions to invest or reinvest the Escrow Fund. Receipt, investment and reinvestment of the Escrow Amount shall be confirmed by the Escrow Agent as soon as practicable by account statement, and any discrepancies in any such account statement shall be noted by the parties to the Escrow Agent within thirty (30) calendar days after receipt thereof. In the event no written instruction is given, the Escrow Agent shall invest in a money market deposit account.

4.    **Disposition and Termination**.

(a)    The Escrow Agent shall release and distribute the Escrow Deposit as follows:

(i)    If the Escrow Agent receives joint written instructions signed by Purchaser and Seller, or a certified copy of a final, non-appealable order of a court of competent jurisdiction, in either case directing delivery of all or part of the Escrow Deposit, the Escrow Agent shall deliver the Escrow Deposit as so directed.

(ii)    Upon a final determination made in accordance with Section 1.9 of the Purchase Agreement that Seller is obligated to pay to Purchaser an amount equal to the Final Working Capital Adjustment, Purchaser and Seller shall give joint written instructions to the Escrow Agent, and the Escrow Agent shall promptly pay to Purchaser the amount set forth in such notice, as contemplated in Section 1.9 of the Purchase Agreement.

(iii)    Upon written notice (a "*Claim Notice*") from Purchaser to the Escrow Agent and Seller setting forth a claim (a "*Claim*") that Purchaser (or a Purchaser Indemnified Party) is entitled to indemnification in accordance with the Purchase Agreement (the "*Claim Amount*") and demanding payment of a Claim Amount from the Escrow Deposit, upon receipt of such notice, and, unless the Escrow Agent receives from Seller a notice contesting Purchaser's right to all or a portion of the Claim Amount within fifteen (15) business days after delivery of such Claim Notice, the Escrow Agent shall pay to Purchaser promptly after expiration of such fifteen (15) business day period the full Claim Amount demanded by Purchaser. Seller shall send Escrow Agent and Purchaser a copy of any notice contesting Purchaser's right to all or a portion of the Claim Amount simultaneously. If at any time and from time to time during the fifteen (15) business day period the Escrow Agent receives notice from Seller contesting Purchaser's right to all or any portion of the Claim Amount, the Escrow Agent shall promptly forward to Purchaser a copy of Seller's notice, and retain the Claim Amount in escrow until receipt of (A) joint written instructions signed by Purchaser and Seller, or (B) a copy of a final, non-appealable order of a court of competent jurisdiction, in each case setting forth the manner

in which the Escrow Agent shall dispose of the Claim Amount. Upon receipt of any such instructions, order or decision, the Escrow Agent shall promptly comply with its terms.

(iv)     On June 29, 2008, (A) if there has been a Final Resolution of Specific Claims, in accordance with the written instructions of Purchaser and Seller, the Escrow Agent shall distribute from the Escrow Deposit (I) an amount equal to the amount by which the Escrow Deposit exceeds the aggregate amount of all Claim Amounts that remain unresolved or are being disputed pursuant to <u>Section 4(a)(iii)</u> hereof, and (II) all interest income theretofore earned on the Escrow Deposit (less the interest attributable to the Claim Amounts), and (B) if there has not been a Final Resolution of the Specific Claims, in accordance with the written instructions of Purchaser and Seller, the Escrow Agent shall distribute from the Escrow Deposit (I) an amount equal to the amount by which the Escrow Deposit (less the Litigation Reserve Amount) exceeds the aggregate amount of all Claim Amounts (including with respect to the Specific Claims the amount thereof in excess of the Litigation Reserve Amount, if any) that remain unresolved or are being disputed pursuant to <u>Section 4(a)(iii)</u> hereof, and (II) all interest income theretofore earned on the amount of the Escrow Deposit being distributed pursuant to clause (B)(I) above. The balance of the Escrow Deposit shall be held by the Escrow Agent until receipt by the Escrow Agent of (i) joint written instructions signed by Purchaser and Seller, or (ii) a copy of a final, non-appealable order of a court of competent jurisdiction, in each case setting forth the determination of each of the pending Claims, subject to Section 4(a)(v) below with respect to the Litigation Reserve Amount. Upon receipt of any such instructions or order, the Escrow Agent shall promptly comply with its terms and shall pay the Claim Amount(s) relating to the Claim(s) that had been disputed in accordance with such instructions or order; <u>provided</u>, <u>however</u>, that the interest income earned on the Claim Amount(s) shall be paid to the parties in proportion to the relative disbursement of the Claim Amount(s) pursuant to such instructions or order. If the amount of any pending Claim for which a Claim Amount was held by the Escrow Agent in accordance with this <u>Section 4(a)(iv)</u> is resolved by Purchaser and Seller, then Purchaser and Seller shall provide joint written notice authorizing the Escrow Agent to release the Claim Amount (and any interest income earned thereon) to Purchaser or Seller, as the case may be. All written instructions pursuant to this Section will include the amounts to be disbursed and any and all necessary calculations.

(v)     At such time as there is Final Resolution of the Specific Claims, in accordance with the written instructions of Purchaser and Seller, the Escrow Agent shall distribute from the Escrow Deposit (I) to Purchaser (or any Purchaser Indemnified Party) the amount of such party's Damages that have not yet been paid or for which such party has not yet been indemnified with respect to such Specific Claims (including any Damages resulting from the Final Resolution of such Specific Claim), and (II) to Seller, the amount of the balance of the Litigation Reserve Fund, less the payments to Purchaser set forth in clause (I) above, any payments made or required to be made to any third party in connection with such Final Resolution and the amount subject to any other then outstanding Claims (to the extent the aggregate Claim Amount in respect thereof exceeds the amount of the Escrow Deposit (excluding the Litigation Reserve Fund) as of such time).

(b)    If any dispute arises in connection with this Agreement, the Escrow Agent may at any time commence an action in the nature of interpleader or other legal proceedings and may deposit the Escrow Deposit with the clerk of the court.

(c)    Upon delivery or deposit of the entire amount of the Escrow Deposit as provided in this Section 3, the Escrow Agent shall be released and discharged from any further obligation under this Agreement, subject to Section 8.

5.    **Escrow Agent**. The Escrow Agent undertakes to perform only such duties as are expressly set forth herein and no duties shall be implied. The Escrow Agent shall have no liability under and no duty to inquire as to the provisions of any agreement other than this Escrow Agreement. The Escrow Agent may rely upon and shall not be liable for acting or refraining from acting upon any written notice, instruction or request furnished to it hereunder and believed by it to be genuine and to have been signed or presented by the proper party or parties. The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document. The Escrow Agent shall have no duty to solicit any payments which may be due it or the Escrow Fund. The Escrow Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction determines that the Escrow Agent's gross negligence or willful misconduct was the primary cause of any loss to Purchaser or Seller. The Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through agents or attorneys (and shall be liable only for the careful selection of any such agent or attorney) and may consult with counsel, accountants and other skilled persons to be selected and retained by it. The Escrow Agent shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel, accountants or other skilled persons. In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any party hereto which, in its opinion, conflict with any of the provisions of this Escrow Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be directed otherwise in writing by all of the other parties hereto or by a final order or judgment of a court of competent jurisdiction. Anything in this Escrow Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

6.    **Succession**. The Escrow Agent may resign and be discharged from its duties or obligations hereunder by giving ten (10) days advance notice in writing of such resignation to the other parties hereto specifying a date when such resignation shall take effect. The Escrow Agent shall have the right to withhold an amount equal to any amount due and owing to the Escrow Agent, plus any costs and expenses the Escrow Agent shall reasonably believe may be incurred by the Escrow Agent in connection with the termination of the Escrow Agreement. Any corporation or association into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or association to which all or substantially all the escrow business of the Escrow Agent's business may be transferred, shall be the Escrow Agent under this Escrow Agreement without further act.

7.    **Fees**. Purchaser and Seller agree jointly and severally to (i) pay the Escrow Agent upon execution of this Escrow Agreement and from time to time thereafter reasonable compensation for the services to be rendered hereunder, which unless otherwise agreed in writing shall be as described in Schedule 1 attached hereto, and (ii) pay or reimburse the Escrow Agent upon request for all expenses, disbursements and advances, including reasonable attorney's fees and expenses, incurred or made by it in connection with the preparation, execution, performance, delivery, modification and termination of this Escrow Agreement.

8.    **Indemnity**. Purchaser and Seller shall jointly and severally indemnify, defend and save harmless the Escrow Agent and its directors, officers, agents and employees (the "indemnitees") from all loss, liability or expense (including the fees and expenses of in-house or outside counsel) arising out of or in connection with (i) the Escrow Agent's execution and performance of this Escrow Agreement, except in the case of any indemnitee to the extent that such loss, liability or expense is due to the gross negligence or willful misconduct of such indemnitee, or (ii) its following any instructions or other directions from Purchaser or Seller, except to the extent that its following any such instruction or direction is expressly forbidden by the terms hereof. The parties hereto acknowledge that the foregoing indemnities shall survive the resignation or removal of the Escrow Agent or the termination of this Escrow Agreement. The parties hereby grant the Escrow Agent a lien on, right of set-off against and security interest in the Escrow Fund for the payment of any claim for indemnification, compensation, expenses and amounts due hereunder.

9.    **Account Opening Information/TINs**.

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT

For accounts opened in the US:
To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. When an account is opened, we will ask for information that will allow us to identify relevant parties.

For non-US accounts:
To help in the fight against the funding of terrorism and money laundering activities we are required along with all financial institutions to obtain, verify, and record information that identifies each person who opens an account. When you open an account, we will ask for information that will allow us to identify you.

TINs
Purchaser and Seller each represent that its correct Taxpayer Identification Number ("TIN") assigned by the Internal Revenue Service ("IRS") or any other taxing authority is set forth in Schedule 1. Upon execution of this Agreement, Purchaser and Seller shall provide the Escrow Agent with a fully executed W-8 or W-9 IRS form, which shall include Purchaser's and Seller's TIN. In addition, all interest or other income earned under the Escrow Agreement shall be allocated and/or paid as directed in a joint written direction of Purchaser and Seller and reported by the recipient to the Internal Revenue Service or any other taxing authority. Notwithstanding

such written directions, Escrow Agent shall report and, as required withhold any taxes as it determines may be required by any law or regulation in effect at the time of the distribution. In the absence of timely direction, all proceeds of the Escrow Fund shall be retained in the Escrow Fund and reinvested from time to time by the Escrow Agent as provided in Section 3. In the event that any earnings remain undistributed at the end of any calendar year, Escrow Agent shall report to the Internal Revenue Service or such other authority such earnings as it deems appropriate or as required by any applicable law or regulation or, to the extent consistent therewith, as directed in writing by Purchaser and Seller.  In addition, Escrow Agent shall withhold any taxes it deems appropriate and shall remit such taxes to the appropriate authorities.

10.    **Notices**.  All communications hereunder shall be in writing and shall be deemed to be duly given and received:

(a)    upon delivery if delivered personally or upon confirmed transmittal if by facsimile;

(b)    on the next Business Day (as hereinafter defined) if sent by overnight courier; or

(c)    four (4) Business Days after mailing if mailed by prepaid registered mail, return receipt requested, to the appropriate notice address set forth on Schedule I or at such other address as any party hereto may have furnished to the other parties in writing by registered mail, return receipt requested.

Notwithstanding the above, in the case of communications delivered to the Escrow Agent pursuant to (b) and (c) of this Section 10, such communications shall be deemed to have been given on the date received by the Escrow Agent. In the event that the Escrow Agent, in its sole discretion, shall determine that an emergency exists, the Escrow Agent may use such other means of communication as the Escrow Agent deems appropriate. "***Business Day***" shall mean any day other than a Saturday, Sunday or any other day on which the Escrow Agent located at the notice address set forth on Schedule 1 is authorized or required by law or executive order to remain closed.

11.    **Security Procedures**.  In the event funds transfer instructions are given (other than in writing at the time of execution of this Escrow Agreement, as indicated in Schedule 1 attached hereto), whether in writing, by telecopier or otherwise, the Escrow Agent is authorized to seek confirmation of such instructions by telephone call-back to the person or persons designated on Schedule 2 hereto ("Schedule 2"), and the Escrow Agent may rely upon the confirmation of anyone purporting to be the person or persons so designated.  The persons and telephone numbers for individuals authorized to give or confirm payment instructions may be changed only in a writing actually received and acknowledged by the Escrow Agent.  If the Escrow Agent is unable to contact any of the authorized representatives identified in Schedule 2, the Escrow Agent is hereby authorized to seek confirmation of such instructions by telephone call-back to any one or more of your executive officers, ("***Executive Officers***"), which shall include the titles of President and Chief Executive Officer, as the Escrow Agent may select. Such "Executive Officer" shall deliver to the Escrow Agent a fully executed Incumbency Certificate,

and the Escrow Agent may rely upon the confirmation of anyone purporting to be any such officer. The Escrow Agent and the beneficiary's bank in any funds transfer may rely solely upon any account numbers or similar identifying numbers provided by Purchaser or Seller to identify (i) the beneficiary, (ii) the beneficiary's bank, or (iii) an intermediary bank. The Escrow Agent may apply any of the escrowed funds for any payment order it executes using any such identifying number, even when its use may result in a person other than the beneficiary being paid, or the transfer of funds to a bank other than the beneficiary's bank or an intermediary bank designated. The parties to this Escrow Agreement acknowledge that these security procedures are commercially reasonable. All funds transfer instructions must include the signature of the person(s) authorizing said funds transfer.

12.    **Miscellaneous**.    The provisions of this Escrow Agreement may be waived, altered, amended or supplemented, in whole or in part, only by a writing signed by all of the parties hereto. Neither this Escrow Agreement nor any right or interest hereunder may be assigned in whole or in part by any party, except as provided in Section 6, without the prior consent of the other parties. This Escrow Agreement shall be governed by and construed under the laws of the State of New York. Each party hereto irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consents to service of process by mail or in any other manner permitted by applicable law and consents to the jurisdiction of the courts located in the State of New York. The parties further hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising or relating to this Escrow Agreement. No party to this Escrow Agreement is liable to any other party for losses due to, or if it is unable to perform its obligations under the terms of this Escrow Agreement because of, acts of God, fire, floods, strikes, equipment or transmission failure, or other causes reasonably beyond its control. This Escrow Agreement may be executed in one or more counterparts, including facsimiles, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

13.    **Definitions**. For purposes of this Agreement:

(a)    *"Specific Claims"* shall mean the summons and complaint dated November 8, 2006 and filed in the Circuit Court of Hancock County, West Virginia, in connection with Civil Action no. 06-C-235-W, and all related matters and claims with respect thereto and/or the fire at Seller's premises in New Cumberland, West Virginia on or about July 18, 2006.

(b)    *"Final Resolution"* shall mean, with respect to any matter, a final settlement or a final judgment in a non-appealable order of a court of competent jurisdiction of such matter.

[End of Text]

**IN WITNESS WHEREOF**, the parties hereto have executed this Escrow Agreement as of the date set forth above.

<div align="center">

**ESCROW AGENT:**

**JPMORGAN CHASE BANK, N.A.**
**as Escrow Agent**

By:_____

**PURCHASER:**

**A1 SOLUTIONS, INC.**

By:_____
Name:

**SELLER:**

**JAMEGY, INC.**

By:_____

</div>

**IN WITNESS WHEREOF**, the parties hereto have executed this Escrow Agreement as of the date set forth above.

**JPMORGAN CHASE BANK, N.A.**
**as Escrow Agent**

By: _Larissa Urcia_

Name:

Title:

Larissa R. Urcia
Vice President

**PURCHASER:**
**Al Solutions, Inc.**


By:_____

Name:

Title:


**SELLER:**
**Jamegy, Inc.**


By:_____

Name: Devin Megy

Title: Chief Executive Officer

[Signature Page to Escrow Agreement]

**IN WITNESS WHEREOF**, the parties hereto have executed this Escrow Agreement as of the date set forth above.

JPMORGAN CHASE BANK, N.A.
as Escrow Agent

By:_____
Name:
Title:

**PURCHASER:**
**Al Solutions, Inc.**

By _Henry B. Goddard III_
Name:  Henry B. Goddard III
Title:   President

**SELLER:**
**Jamegy, Inc.**

By:_____
Name: Devin Megy
Title: Chief Executive Officer

**IN WITNESS WHEREOF**, the parties hereto have executed this Escrow Agreement as of the date set forth above.

<div style="margin-left: 40%;">

**JPMORGAN CHASE BANK, N.A.**
**as Escrow Agent**

By:_____
Name:
Title:


**PURCHASER:**
**Al Solutions, Inc.**


By:_____
Name:
Title:


**SELLER:**
**Jamegy, Inc.**

By: _____
Name: Devin Megy
Title:   Chief Executive Officer

</div>

**Schedule 1**

**Name of Purchaser:** Al Solutions, Inc.
Purchaser Notice Address:
      PO Box 1224, South Chester Street
      New Cumberland, WV 26047
Purchaser TIN:    4847
Wiring Instructions:
      PNC Bank:
      ABA #043000096
      Credit Account #     6736  (Al Solutions, Inc.)

| Name of Seller: | Jamegy, Inc. | | |
|---|---|---|---|
| Notice Address: | c/o Joseph Megy<br>137 Casa Sueno Court<br>Richland, WA 99352<br>(509) 628-9223 | c/o Devin Megy<br>136 Lincoln Highlands Dr<br>Coraopolis, PA 15108<br>(208) 964-6405 | With a copy to:<br>Adam Salassi<br>Cooley Godward Kronish LLP<br>11951 Freedom Drive<br>Reston, VA 20190-5656 |

Seller TIN:    3220
Wiring Instructions:
      PNC Bank:
      ABA #043000096
      Credit Account #    8203  (Titan Holdings)

**Escrow Deposit: $10,000,000**

**Investment:**        [specify]

    [X]      JPMorgan Chase Bank Money Market Account;

    []      A trust account with JPMorgan Chase Bank, N.A.;

    []      A money market mutual fund, including without limitation the JPMorgan Fund or any other mutual fund for which the Escrow Agent or any affiliate of the Escrow Agent serves as investment manager, administrator, shareholder servicing agent and/or custodian or subcustodian, notwithstanding that (i) the Escrow Agent or an affiliate of the Escrow Agent receives fees from such funds for services rendered, (ii) the Escrow Agent charges and collects fees for services rendered pursuant to this Escrow Agreement, which fees are separate from the fees received from such funds, and (iii) services performed for such funds and pursuant to this Escrow Agreement may at times duplicate those provided to such funds by the Escrow Agent or its affiliates. <u>Fund</u>

**Escrow Agent notice address:**    JPMorgan Chase Bank, N.A.
Escrow Services
4 New York Plaza, 21st Floor
New York, NY 10004
Attention: Joe Morales
Fax No.: (212) 623-6830

**Escrow Agent's compensation:**    **$2,500 per annum (without pro-ration for partial years)**

**Schedule 2**

**Telephone Number(s) and signature(s) for**
**Person(s) Designated to give and confirm Funds Transfer Instructions**

If to Purchaser:

| Name | Telephone Number | Signature |
|------|------------------|-----------|
| 1. Henry B. Goddard III | 781-272-7910 | _Henry B Goddard III_ |
| 2. Troy Kenyon | 781-272-7910 | _____ |

If to Sellers:

| Name | Telephone Number | Signature |
|------|------------------|-----------|
| 1. Devin Megy | _____ | _____ |
| 2. Joseph Megy | _____ | _____ |

Telephone call-backs shall be made to both Purchaser and Sellers if joint instructions are required pursuant to the agreement. All funds transfer instructions must include the signature of the person(s) authorizing said funds transfer.

If only one party may confirm or instruct funds transfers:

   Periodically, you issue payment orders to us to transfer funds by federal funds wire. We review the orders to determine compliance with the governing documentation and to confirm signature by the appropriate party, in accordance with the incumbency list previously supplied to us. Bank policy requires that, where practicable, we undertake callbacks to a party other than the individual who signed the payment order to verify the authenticity of the payment order.

Inasmuch as you are the only employee in your office who can confirm and instruct wire transfers in accordance with the Escrow Agreement, we will call you to confirm any federal funds wire transfer payment order purportedly issued by you. Your continued issuance of payment orders to us and confirmation in accordance with this procedure will constitute your agreement (1) to the callback security procedure outlined herein and (2) that the security procedure outlined herein constitutes a commercially reasonable method of verifying the authenticity of payment orders. Moreover, you agree to accept any risk associated with a deviation from this bank policy.

**Schedule 2**

**Telephone Number(s) and signature(s) for**
**Person(s) Designated to give and confirm Funds Transfer Instructions**

If to Purchaser:

| Name | Telephone Number | Signature |
|------|------------------|-----------|
| 1.  Henry B. Goddard III | 781-272-7910 | |
| 2.  Troy Kenyon | 781-272-7910 | |

If to Sellers:

| Name | Telephone Number | Signature |
|------|------------------|-----------|
| 1.  Devin Megy | 208-964-6405 | |
| 2.  Joseph Megy | 509-628-9223 | |

Telephone call-backs shall be made to both Purchaser and Sellers if joint instructions are required pursuant to the agreement. All funds transfer instructions must include the signature of the person(s) authorizing said funds transfer.

If only one party may confirm or instruct funds transfers:

Periodically, you issue payment orders to us to transfer funds by federal funds wire. We review the orders to determine compliance with the governing documentation and to confirm signature by the appropriate party, in accordance with the incumbency list previously supplied to us. Bank policy requires that, where practicable, we undertake callbacks to a party other than the individual who signed the payment order to verify the authenticity of the payment order.

Inasmuch as you are the only employee in your office who can confirm and instruct wire transfers in accordance with the Escrow Agreement, we will call you to confirm any federal funds wire transfer payment order purportedly issued by you. Your continued issuance of payment orders to us and confirmation in accordance with this procedure will constitute your agreement (1) to the callback security procedure outlined herein and (2) that the security procedure outlined herein constitutes a commercially reasonable method of verifying the authenticity of payment orders. Moreover, you agree to accept any risk associated with a deviation from this bank policy.

8019/73489-001 Current/9122498v7

11